Exhibit A

MICHAEL T. HENSLEY, Id. No. 031952001
BRESSLER, AMERY & ROSS
A Professional Corporation
325 Columbia Turnpike
Florham Park, New Jersey 07932
P.O. Box 1980
Morristown, New Jersey 07962
(973) 514-1200
Attorneys for Plaintiff
Quest Diagnostics Incorporated

| | |
|---|---|
| QUEST DIAGNOSTICS INCORPORATED,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL D'ASCOLI,<br><br>Defendant. | SUPERIOR COURT OF NEW JERSEY<br>CHANCERY DIVISION –<br>GENERAL EQUITY<br>MORRIS COUNTY<br>DOCKET NO: C- _151 - 15_<br><br>Civil Action<br><br>**VERIFIED COMPLAINT<br>AND JURY DEMAND** |

Plaintiff Quest Diagnostics Incorporated ("Quest"), through its attorneys Bressler, Amery & Ross, P.C., by way of its Verified Complaint against Defendant Michael D'Ascoli ("D'Ascoli"), hereby states:

## NATURE OF THE CASE

1.     This is a case about a former Quest employee, D'Ascoli, who violated his loyalty, non-disclosure and non-solicitation obligations by competing for Quest's customers while still employed at Quest, misappropriating and disclosing Quest's Confidential Information[1], and improperly soliciting Quest Customers.

2.     As a result of D'Ascoli's unlawful conduct, Quest seeks an injunction enforcing the terms of D'Ascoli's 2015 Sales Incentive Plan (the "Plan") and prohibiting him from: (i)

---

[1] Capitalized terms are defined in the 2015 Sales Incentive Plan for Prescription Drug Account Executives.

possessing, utilizing or disclosing to third parties, Quest's Confidential Information, defined pursuant to the Plan as information not generally known to the public, including, but not limited to, business plans, formulas, processes, methods of manufacture, machines, compositions, lists of customers, sales or marketing manuals, strategies, special price tables or schedules, inventions of Quest or any of Quest's affiliates; and (ii) contacting or soliciting, whether directly or indirectly, any Quest Customer, (defined pursuant to the Plan as any person or entity to which D'Ascoli, within the twelve (12) month period immediately preceding D'Ascoli's termination, on behalf of Quest, sold Competitive Services or made a proposal to sell Competitive Services) for the purpose of selling or providing Competitive Services (defined pursuant to the Plan as products or services that D'Ascoli sold on behalf of Quest during the twelve (12) month period immediately preceding the termination of his employment) up and until August 14, 2016.  Quest also seeks money damages.

## THE PARTIES

3.      Plaintiff Quest is a Delaware corporation with its principal place of business in Madison, New Jersey.  Quest is a diagnostic laboratory which specializes in, among other things, providing clinical and laboratory services, including toxicology services, to patients, hospitals, doctors, and healthcare providers.

4.      Defendant D'Ascoli was employed by Quest as an Account Manager and Account Executive of Prescription Drug Monitoring from 2010 to August 14, 2015.  D'Ascoli resides at 4 Benjamin Lane, East Haddam, Connecticut 06423.  Unbeknownst to Quest, D'Ascoli also became employed by PSI Services, Inc. ("PSI") as a Toxicology Consultant on July 6, 2015.  From July 6, 2015 to August 14, 2015, while still employed by Quest, D'Ascoli was secretly working for PSI which is a direct competitor of Quest.

## JURISDICTION AND VENUE

5.      This Court has personal jurisdiction over D'Ascoli as D'Ascoli consented to same in the Plan where he agreed to the following: "The law of the State of New Jersey shall govern my non-solicitation and non-disclosure obligations which are set forth in this section of the Plan. Any dispute related to my non-solicitation and non-disclosure obligations, which are set forth in this section of the Plan, shall be submitted exclusively to the federal or state courts of the State of New Jersey."   D'Ascoli further agreed that he "submit[s] to the personal jurisdiction of the foregoing federal and state courts and waive[s] any objection or defense based on personal jurisdiction or venue that might otherwise be asserted in proceedings in those courts."  Further, D'Ascoli's breaches had an effect in New Jersey and caused foreseeable injury to Quest in New Jersey.

6.      Pursuant to <u>R.</u> 4:3-2 venue is properly laid in Morris County because the causes of action arose in this county, and Quest's principal place of business is located in this county.

7.      Pursuant to <u>R.</u> 4:3-1 venue is properly laid in the Chancery Division because, although money damages are sought, Quest's principal relief sought is equitable.

## RELEVANT FACTS

**A.      D'Ascoli's Employment with Quest and the Plan**

8.      In or around September 2010, D'Ascoli was offered, and thereafter accepted employment with Quest as an Account Manager within Quest's Wallingford Business Unit in Wallingford, Connecticut.

9.      D'Ascoli's job duties were selling the Quest portfolio of laboratory testing solutions to physicians and providers.

10.     In conjunction with this employment, D'Ascoli entered into an Account Manager Sales Compensation Plan with Quest which contained, among other things, non-solicitation provisions.

11.     On or about February 2012, D'Ascoli was offered a promotion from an Account Manager to an Account Executive for Prescription Drug Monitoring at Quest.

12.     D'Ascoli's duties in this new position included selling prescription drug testing and toxicology testing solutions to providers and hospitals.

13.     On or about February 9, 2012, D'Ascoli accepted the promotion to Account Executive and further acknowledged his non-solicitation and non-disclosure obligations to Quest.

14.     D'Ascoli was offered and accepted a sales compensation plan every year, including 2015, which contained non-solicitation and non-disclosure provisions.

15.     The Plan contained numerous provisions relevant to this lawsuit. The Plan states, in part:

> For a period of one (1) year following the date my employment is terminated, for any reason, I will not contact or solicit, whether directly or indirectly, any Customer of the Company for the purpose of selling or providing Competitive Services.
>
> * * *
>
> For a period of one (1) year following the date my employment is terminated, for any reason, I agree that I will not hire or solicit, whether directly or indirectly, any employee of Quest Diagnostics for a position of employment with any person or entity that competes in providing the goods or services provided by Quest Diagnostics.
>
> * * *
>
> I agree that while employed by Quest Diagnostics and subsequent to such employment, I shall not, for any purpose whatsoever, use, divulge, or disclose to any person or entity any Confidential Information which I have obtained as a result of my association

with Quest Diagnostics, and further agree that I shall not in any way make use of any Confidential Information pertaining to Quest Diagnostics' activities or business . . . For purposes of this Agreement, "Confidential Information" means Company information not generally known to the public, including, but is not limited to, business plans, formulas, processes, methods of manufacture, machines, compositions, lists of customers, sales or marketing manuals, strategies, special price tables or schedules, inventions of the Company or any of the Company's affiliates.

16.     Quest has gone to great expense and effort to develop and maintain its customer relationships and to compile its Confidential Information, defined as "information not generally known to the public, including, but it is not limited to, business plans, formulas, processes, methods of manufacture, machines, compositions, list of customers, sales or marketing manuals, strategies, special price tables or schedules, inventions of [Quest] or [Quest's] affiliates."

17.     These expenditures and efforts include, but are not limited to, developing a business plan, developing a compensation structure, budgets, labor and other costs, profit margins, training personnel and developing an infrastructure to develop and continue to service customers.

18.     The Confidential Information developed and compiled through Quest's efforts is not readily available to its competitors.

19.     During the course of his employment with Quest, D'Ascoli acquired, and otherwise obtained, access to a wide range of Confidential Information based upon his agreement to preserve the confidentiality of such Confidential Information. The Confidential Information is unique to Quest and is critical to its operations and business including competing with others in this limited and specialized market.

20.     At all times, Quest took reasonable precautions to protect its Confidential Information from disclosure to the public and has invested substantial resources in the development and retention of its customers.

21.     D'Ascoli voluntarily resigned from his employment with Quest on July 31, 2015, and his last day working for Quest was August 14, 2015.

**B.      D'Ascoli Secretly Competed and Solicited Customers for His Post-Quest Employment While Employed at Quest**

22.     Prior to D'Ascoli's resignation, he engaged in multiple instances of misconduct, unfair competition, and breaches of his duty of loyalty,  including soliciting Customers to advise them of his departure from Quest in the hopes of usurping their business for his post-Quest employment.

23.     Despite being still employed by Quest until August 14, 2015, D'Ascoli secretly became employed with PSI on July 6, 2015, and worked during that timeframe to unfairly compete, secretly solicit Quest Customers and misappropriate Quest Confidential Information.

24.     On July 29, 2015, in anticipation of his resignation from Quest (but while still employed by Quest), D'Ascoli emailed Quest Customer Wellmore Behavioral Health requesting that the Customer meet with him in the coming weeks to discuss the Customer's services. D'Ascoli was still employed by Quest on July 29, but secretly was also employed by PSI and soliciting Wellmore.

25.     This contact, while still employed by Quest, is an unmistakable breach and improper solicitation.

26.     D'Ascoli contacted other Quest Customers while employed at Quest to solicit business for his post-Quest employment, including The Connection, MCCA and Waynik Group.

27.     D'Ascoli has significant knowledge of Quest's business practices, strategies, and pricing lists and used that to his advantage by communicating to Quest Customers that he would be able to offer them lower rates at his new employer.

28.     PSI entered into a sales and marketing contract with another Quest competitor, Sterling Heathcare OPCO, LLC d/b/a Cordant Health Solutions ("Cordant"). D'Ascoli solicited Quest Customers on behalf of PSI and Cordant.

**C.     D'Ascoli Misappropriated Quest's Confidential, Proprietary and Sensitive Information**

29.     On or about August 21, 2015, Quest had a forensic analysis conducted on D'Ascoli's Quest laptop computer and Apple iPad that he returned to Quest once he resigned.

30.     The forensic analysis revealed that D'Ascoli misappropriated highly confidential, proprietary and sensitive information and documents where D'Ascoli, among other things, e-mailed voluminous highly sensitive Confidential Information to his private e-mail address immediately prior to leaving the employment of Quest.

31.     The misappropriation is made even more egregious where the forensic analysis further revealed that D'Ascoli made a previous attempt to access Quest's highly confidential, proprietary and sensitive information and documents through the use of a USB Device, but was unsuccessful.

32.     On July 9, 2015, three (3) days after becoming secretly employed by PSI, D'Ascoli connected a mass storage device in the form of a USB device to his computer in an attempt to improperly copy Quest's Confidential Information.

33.     On July 28, 2015, three (3) days prior to his resignation, D'Ascoli connected a mass storage device in the form of a USB Device to his computer in an attempt to improperly copy Quest's Confidential Information.

34.     Quest's policies prohibit the connection and use of USB Devices to Quest computers, and instead requires Quest-specific encrypted flash drives for access.

35.     Quest's computers have safeguards that prevent the use of personal USB Devices and D'Ascoli was therefore unsuccessful in his July 9 and July 28 attempts to improperly misappropriate Quest's confidential, proprietary and sensitive information and documents.

36.     D'Ascoli thereafter successfully misappropriated Quest's confidential, proprietary and sensitive information and documents on August 3, 2015, three (3) days after he tendered resignation to Quest, by e-mailing nineteen (19) communications from his Quest account to his personal email account.

37.     The nineteen (19) communications included nineteen (19) attachments, which contained the following documents:

1.  IMS Report (Annualized Prescription Data)
2.  Why Quest for Drug Monitoring?
3.  Why Rx Drug Monitoring?
4.  CIGNA PDM Targets
5.  DAP Testing Clients
6.  DAP Testing Clients (Print File)
7.  IMS Edit (Prescription Level Data)
8.  IMS Tox Data (Annualized Prescription Data)
9.  Millennium (Clients Using Same)
10. PDM High Rx
11. PDM High Rx PDM Targets CT
12. PDM Targets CT
13. PDM Terr. (Percentage of Quest PDM Business in Territory)
14. PDM Tops 2015
15. PDM-TOX Opps
16. Rehab Programs
17. Update to Why Rx Drug Monitoring?
18. Wallingford PDM – Rehab Opps
19. Why Rx Drug Monitoring

38.     The nineteen (19) attachments contained three categories of Quest's confidential, proprietary and sensitive information, including (i) Quest-specific and generated marketing materials (the "Marketing Materials"), (ii) Quest's entire book of business of customers, including every account that Quest has and what each account is worth ("Quest's Book of

Business"), and (iii) Quest target strategy for obtaining new clients, including materials and reports purchased by Quest for targeting and investing in certain business areas ("Target Strategy Materials").

39.     The Marketing Materials included Quest promotional documents and marketing messages that were geared towards educating customers on why they should choose Quest for their needs.  The Marketing Materials are proprietary to Quest and their production to another laboratory could permit that laboratory to create their entire marking department based on Quest's materials.

40.     Quest's Book of Business provides information on every single Quest account in the region, including what they are worth on a monthly and annual revenue basis.

41.     The forensic analysis further demonstrated that after improperly forwarding Quest's confidential, proprietary and sensitive information and documents, D'Ascoli deleted all emails and relevant attachments in an attempt to cover his tracks and prevent Quest from learning about his unlawful conduct.

42.     D'Ascoli shared this Confidential Information with PSI and Cordant.

**D.  D'Ascoli's Unlawful Conduct After His Resignation from Quest**

43.     D'Ascoli's employment with PSI involved marketing and selling PSI and Cordant's products and services.

44.     PSI and Cordant are direct competitors of Quest, and engaged in the business of providing toxicology services to medical providers.

45.     Since becoming employed by PSI, and on behalf of Cordant, D'Ascoli has directly and indirectly solicited Quest Customers, and has utilized Quest's Confidential Information, all in direct violation of the Plan.

46.     Quest has obtained evidence of D'Ascoli improper solicitations with Quest's Customers.

47.     On or about June 23, 2015, while secretly employed by PSI working on behalf of Cordant, D'Ascoli attended a meeting with a Quest representative at The Connection, a Quest Customer.   When the Customer requested lower pricing, D'Ascoli indicated he would be in contact with them shortly regarding reduced pricing.  A couple of days later D'Ascoli resigned, D'Ascoli solicited The Connection offered lower pricing, while obviously knowing Quest's strategic pricing.  Thereafter, The Connection terminated its contract for toxicology services with Quest, and became a customer of Cordant through D'Ascoli and PSI.  This improper solicitation was in breach of his restrictive covenants and damages Quest in the amount of $80,000 to $100,000 *per month* on this one account alone.

48.     Further, in or about August or September 2015, D'Ascoli solicited business from ECHN Behavioral Health ("ECHN") by scheduling a meeting with ECHN Behavioral Health personnel.

49.     ECHN communicated to D'Ascoli that they were seeking to enter into a contract with Quest for certain toxicology services.

50.     D'Ascoli scheduled the meeting, but failed to notify ECHN that he was no longer employed by Quest.

51.     Only at the meeting with ECHN did D'Ascoli notify them that he was no longer working with Quest, and instead tried to sell them services from a competitor laboratory.

52.     D'Ascoli has continued to hold himself out as a Quest employee, even listing himself as currently employed at Quest on his LinkedIn page.

53.     Since D'Ascoli's resignation, he has solicited business from the following Quest customers; (i) The Connection, (ii) Project Courage, (iii) New Solutions Pain, (iv) The Children's Center, and (v) CHR Enfield, (vi) Catholic Charities, (vii) Wellmore, and (viii) McCall Foundation.   D'Ascoli conceded to these contacts.

54.     Since D'Ascoli's resignation, he has solicited and accepted business from the following Quest customers (i) The Connection, (ii) Project Courage, (iii) New Solutions Pain, and (iv) The Children's Center.   D'Ascoli conceded to these contacts.   Quest's lost annual revenue on these customers exceeds $1,500,000.00.

55.     By letter dated August 31, 2015, Quest reminded D'Ascoli of the Plan and his non-solicitation and non-disclosure obligations thereunder.   Quest further notified Cordant and PSI.

56.     As a result of the forensic analysis and information provided by Quest Customers that D'Ascoli was soliciting their business, on October 15, 2015, Quest demanded by letter that D'Ascoli cease and desist from, among other things, unlawfully soliciting Quest's Customers in violation of the Plan.   Quest further notified Cordant and PSI.

57.     Based on the forensic analysis demonstrating that D'Ascoli improperly misappropriated Quest's Confidential Information, Quest further demanded that D'Ascoli, among other things, provide a detailed accounting and return to Quest originals and copies of any Confidential Information belonging to Quest and the identity of any person that D'Ascoli shared the information with and the method by which he shared it.

58.     D'Ascoli has financially benefitted from his breach of the Plan.

59.     A temporary restraining order and injunction is necessary to attempt to preserve the status quo and prevent further harm to Quest.  As set forth above, the harm to Quest is irreparable and cannot be quantified in just monetary terms.

## FIRST COUNT
### (Injunctive and Equitable Relief)

60.     Quest repeats and re-alleges all of the prior allegations of the Verified Complaint as if fully set forth at length herein.

61.     As set forth above, D'Ascoli has engaged in an ongoing and unlawful effort to steal business from Quest, including by unlawfully soliciting and/or servicing Quest customers, competing with Quest on behalf of PSI and Cordant, and unlawfully disclosing confidential and proprietary information in violation of the Plan.

62.     Injunctive relief in the form of a temporary, preliminary and permanent injunction is necessary to maintain the status quo and prevent irreparable harm upon Plaintiff, in the form set forth in the Prayer for Relief below and the order to show cause submitted herewith. Injunctive relief is appropriate because remediation is a form of equitable relief requiring continuing supervision necessitating more than mere monetary relief.

63.     No adequate remedy at law exists.

## SECOND COUNT
### (Breach of Contract)

64.     Quest repeats and re-alleges all of the prior allegations of the Verified Complaint as if fully set forth at length herein.

65.     The Plan that D'Ascoli entered into with Quest constitutes a binding, enforceable and valid contract with Quest.

66.     Quest has fully and faithfully performed all of its duties and obligations under the Plan.

67.     The employment and post-employment obligations contained in the Plan are reasonable and necessary to protect Quest's legitimate business interests.

68.     D'Ascoli has breached the Plan by (a) misappropriating Quest's Confidential Information; and (b) directly and/or indirectly soliciting Quest's Customers for his own benefit and the benefit of PSI Pharmaceuticals.

69.     Quest has suffered, and will continue to suffer, *inter alia*, irreparable harm including, but not limited to, its ability to retain its customers, as a direct result of D'Ascoli's breach of the Agreements.

70.     In addition to the irreparable harm suffered by Quest a result of the breach by D'Ascoli, Quest has suffered monetary damages in an amount as yet to be determined.

## THIRD COUNT
### (Breach of the Implied Covenant of Good Faith and Fair Dealing )

71.     Quest repeats and re-alleges all of the prior allegations of the Verified Complaint as if fully set forth at length herein.

72.     As set forth above, D'Ascoli entered into the Plan that provides for certain obligations and restrictions upon D'Ascoli following termination of employment including, but not limited, restrictions on competition and the use of Quest's confidential information.

73.     The Plan is a valid contract with the exchange of sufficient consideration.

74.     The Plan set forth additional material obligations with which D'Ascoli has failed to comply and, in fact, has willfully and knowingly violated.

75.     Implied in every contract is the covenant of good faith and fair dealing.

76.     As set forth above, D'Ascoli has repeatedly breached his covenants.

77.    As result of this breach, Quest has suffered damages.

## FOURTH COUNT
### (Breach of the Duty of Loyalty)

78.    Quest repeats and re-alleges all of the prior allegations of the Verified Complaint as if fully set forth at length herein.

79.    D'Ascoli, as an employee owing a duty of loyalty to Quest, was required to act with good faith and fairness in transactions, with a responsibility to place the corporation's interests ahead of his own personal conflicting interests.

80.    The duty of loyalty required D'Ascoli refrain from soliciting toxicology business from Quest customers for entities other than Quest during his employment.

81.    The duty of loyalty prohibited D'Ascoli from being secretly employed by PSI and Cordant while at the same time employed by Quest.

82.    When D'Ascoli secretly competed, solicited toxicology business from Quest Customers, and misappropriated Confidential Information to the benefit of entities other than Quest while still employed at Quest, D'Ascoli breached his duty of loyalty.

83.    As a result of D'Ascoli's breach of the duty of loyalty, Quest was damaged.

## FIFTH COUNT
### (Misappropriation of Confidential, Proprietary and Trade Secret Information)

84.    Quest repeats and re-alleges all of the prior allegations of the Verified Complaint as if fully set forth at length herein.

85.    Quest's Confidential Information resulted from the expenditure of extensive time, labor, skill and money by Quest.  The Confidential Information developed and compiled through Quest's efforts is not readily available to its competitors.  The Confidential Information entrusted to Quest's employees is the result of the trust and confidence the Quest invests in its employees.

The direct relationships with Quest's Customers enjoyed by Quest's employees is a direct result of Quest's economic support and facilitation.

86.    D'Ascoli acquired Quest's Confidential Information as a result of both his employment relationship with Quest and the unlawful taking of Quest Confidential Information in violation of the Plan.

87.    D'Ascoli is exploiting the confidential relationship which he enjoyed with Quest and its Customers by, *inter alia*, wrongfully retaining and using Quest's Confidential Information to compete with Quest and to solicit Quest Customers. D'Ascoli has thereby obtained a special advantage in the form of a free ride or a head start, because D'Ascoli has not been burdened with any of the expenditures made by Quest to develop its Confidential Information and customer base.

88.    D'Ascoli shared this Confidential Information with PSI and Cordant.

89.    As a result of this breach, Quest has suffered damages.

## SIXTH COUNT
### (Unfair Competition)

90.    Quest repeats and re-alleges all of the prior allegations of the Verified Complaint as if fully set forth at length herein.

91.    D'Ascoli took the actions described in this Verified Complaint in order to gain an unfair competitive advantage over Quest.

92.    D'Ascoli willfully and maliciously took the actions described in this Verified Complaint with knowledge of and disregard for Quest's rights and with the intention of causing harm to Quest for his own benefit.

93.    Without privilege or justification, D'Ascoli has engaged, and is engaging, in unfair competition by, among other things, (a) misappropriating and converting Quest's

Confidential Information and (b) using that information to solicit and otherwise interfere with Quest's Customer relationships.

94.     As a result of his actions, D'Ascoli is unfairly competing in the laboratory services marketplace.

95.     Quest has suffered, and will continue to suffer, among other things, irreparable harm including, but not limited to, its ability to retain its customers, as a direct result of D'Ascoli's unfair competition.

96.     As a result, Quest was damaged.

**SEVENTH COUNT**
**(New Jersey Trade Secrets Act, N.J.S.A. 56:15-1, *et seq.*)**

97.     Quest repeats and re-alleges all of the prior allegations of the Verified Complaint as if fully set forth at length herein.

98.     Quest's Confidential Information derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other people who can obtain economic value from it.  Quest has taken substantial efforts, reasonable under the circumstances, to maintain the secrecy of such information.  As such, this information constitutes a "trade secret," as defined by the New Jersey Trade Secrets Act ("NJTSA"), N.J.S.A. 56:15-1, *et seq*.

99.     As set forth above, D'Ascoli has engaged in an ongoing and unlawful effort to steal business from Quest, including by unlawfully soliciting and/or servicing Quest Customers, competing with Quest on behalf of and with the assistance of PSI and Cordant, and unlawfully possessing and disclosing Confidential Information in violation of the Plan.

100. As set forth above, D'Ascoli has, by improper means, acquired, used and disclosed Quest's Confidential Information, and has disclosed and/or used Quest's trade secrets without the express or implied consent of Quest.

101. As set forth above, D'Ascoli has misappropriated Quest's trade secrets by improper means including, but not limited to, breach of an express duty to maintain the secrecy of, or to limit the use or disclosure of, a trade secret. D'Ascoli has also exceeded the scope of his authorized use of Quest's trade secrets.

102. D'Ascoli's conduct, as aforesaid, was and is in furtherance of a scheme to obtain and convert to his personal use and for his personal gain, Quest's Confidential Information and trade secrets.

103. As a result of this misappropriation, Quest has suffered damages.

## EIGHTH COUNT
### (Unjust Enrichment)

104. Quest repeats and re-alleges all of the prior allegations of the Verified Complaint as if fully set forth at length herein.

105. As more fully set forth above, as a result of his conduct, D'Ascoli has been conferred a benefit and unjustly enriched for certain income at Quest's expense.

106. Equity and good conscience require D'Ascoli to reimburse Quest for any and all income received as a result of his unlawful conduct and associated with the above enrichment.

## PRAYER FOR RELIEF AS TO THE ABOVE COUNTS

**WHEREFORE**, Quest demands judgment (including temporary, preliminary and permanent injunctive relief) against Defendants, as follows:

(a) Temporarily, preliminarily and permanently enjoining and restraining D'Ascoli from possessing, utilizing or disclosing to third parties, Quest's Confidential

17

Information, defined pursuant to the Plan as information not generally known to the public, including, but not limited to, business plans, formulas, processes, methods of manufacture, machines, compositions, lists of customers, sales or marketing manuals, strategies, special price tables or schedules, inventions of Quest or any of Quest's affiliates;

      (b)    Temporarily, preliminary and permanently enjoining and restraining D'Ascoli from contacting or soliciting, whether directly or indirectly, any Quest Customer, (defined pursuant to the Plan as any person or entity to which D'Ascoli, within the twelve (12) month period immediately preceding D'Ascoli's termination, on behalf of Quest, sold Competitive Services or made a proposal to sell Competitive Services) for the purpose of selling or providing Competitive Services (defined pursuant to the Plan as products or services that D'Ascoli sold on behalf of Quest during the twelve (12) month period immediately preceding the termination of his employment) up and until August 14, 2016;

      (c)    Compelling D'Ascoli to, within seven (7) days of the date of entry of this order, provide an accounting under oath of all Quest Confidential Information D'Ascoli took from Quest at any point prior to his termination from Quest, including but not limited to the information identified by the forensic accounting that was e-mailed to D'Ascoli's personal email on August 3, 2015;

      (d)    Compelling D'Ascoli to, within seven (7) days of the date of entry of this order, provide an accounting under oath of all Quest Confidential Information D'Ascoli disclosed to third-parties, the identities of those third-parties, and identify which Confidential Information was provided to each and every third-party;

      (e)    Compelling D'Ascoli to, within seven (7) days of the date of entry of this order, return to Quest's counsel all Quest Confidential Information, including all copies thereof,

as well as all originals and all copies of works, whether prepared by D'Ascoli or others, in his possession or in the possession of others, and to certify to Quest's counsel by that time that all such Quest documents and information have been returned;

(f)     Compelling D'Ascoli to, within seven (7) days of the date of entry of this order, provide to Quest's counsel an accounting under oath of the names of all Quest Customers that D'Ascoli contacted or solicited, directly or indirectly, on behalf of another company or individual while still employed by Quest;

(g)     Compelling D'Ascoli to, within seven (7) days of the date of entry of this order, provide to Quest's counsel an accounting under oath of the names of all Quest Customers that D'Ascoli contacted or solicited, directly or indirectly, on behalf of another company or individual after the termination of his employment with Quest;

(h)     Compelling D'Ascoli to immediately refrain from holding himself out as being associated with Quest until the return date of the preliminary injunction;

(i)     Compelling D'Ascoli to immediately refrain from further contacting or soliciting, directly or indirectly, all Quest Customers until the return date of the preliminary injunction;

(j)     Compelling D'Ascoli to immediately refrain from utilizing any Quest Confidential Information for any purpose;

(k)     Imposing a constructive trust on all income resulting from D'Ascoli's unlawful conduct;

(l)     Awarding compensatory, incidental and consequential damages, including disgorgement of salary and benefits;

(m)     Awarding pre- and post-judgment interest;

19

(n)     Awarding punitive damages to the extent permitted by law;

(o)     Awarding attorneys' fees to the extent permitted by law;

(p)     Awarding costs of suit; and

(q)     Awarding such other and further relief as the Court deems just and proper

or is otherwise allowed and is proper pursuant to applicable law.

## JURY DEMAND

Quest hereby demands a trial by jury on all claims in the Verified Complaint.

## DESIGNATION OF TRIAL COUNSEL

Pursuant to R. 4:25-4, Plaintiff Quest Diagnostics Incorporated designates Michael T. Hensley, Esq. as trial counsel in this matter.

## CERTIFICATION PURSUANT TO RULE 4:5-1

I certify that the matter in controversy is not the subject of any other action in any court or arbitration proceeding, now pending or contemplated, and that no other parties should be joined in this action. I am aware that if any of these statements are willfully false, I am subject to punishment.

BRESSLER, AMERY & ROSS, P.C.
Attorneys for Plaintiff
Quest Diagnostics Incorporated

By: _____
         MICHAEL T. HENSLEY

Dated: 11/3/15

## VERIFICATION

Geoffrey S. Albrecht, of full age, certifies as follows:

1.      I am employed as Vice President of Commercial for the North Region for Plaintiff Quest Diagnostics Incorporated ("Quest").

2.      I have read this Verified Complaint.

3.      The matters stated therein are true and correct to my personal knowledge except as to matters therein stated to be upon information and belief and, as to those matters, I believe them to be true.

I certify that the foregoing statements made by me are true. I am aware that if any of these statements are willfully false, I am subject to punishment.

_____
GEOFFREY S. ALBRECHT

Dated: __11/3/15__

21

## CERTIFICATION OF COPY SIGNATURE

I, Michael T. Hensley, Esq., of full age, certify as follows:

a)      I am an attorney-at-law of the State of New Jersey and a Principal of the firm of Bressler, Amery & Ross, P.C., attorneys for Plaintiff Quest Diagnostics Incorporated in the within action.

b)      The Verification of Geoffrey S. Albrecht submitted with the Verified Complaint contains a copysignature.

c)      Mr. Albrecht has acknowledged that his signature as it appears on his Verification is genuine.  A copy of the Certification of Geoffrey S. Albrecht with original signature pages affixed thereto will be filed with the Court if requested by the Court or any party.

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Michael T. Hensley

Dated:  November 3, 2015

| | |
|---|---|
| QUEST DIAGNOSTICS INCORPORATED,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL D'ASCOLI,<br><br>Defendant. | SUPERIOR COURT OF NEW JERSEY<br>CHANCERY DIVISION –<br>GENERAL EQUITY<br>MORRIS COUNTY<br>DOCKET NO: C- *151-15*<br><br>Civil Action |

---

**QUEST DIAGNOSTICS INCORPORATED'S MEMORANDUM OF LAW IN SUPPORT OF ITS APPLICATION FOR TEMPORARY, PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF**

---

BRESSLER, AMERY & ROSS
A Professional Corporation
325 Columbia Turnpike
Florham Park, New Jersey 07932
P.O. Box 1980
Morristown, New Jersey 07962
(973) 514-1200
Attorneys for Plaintiff
Quest Diagnostics Incorporated

On the Brief:

Michael T. Hensley, Esq.
Lauren Fenton-Valdivia, Esq.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................1

STATEMENT OF FACTS ..................................................................................3

LEGAL ARGUMENT .........................................................................................4

   POINT I ...........................................................................................................4

      QUEST IS ENTITLED TO TEMPORARY, PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF. ...................................................4

         A.    Quest Would Suffer Irreparable Harm Should the Court Not Enjoin D'Ascoli From Further Breaches of His Non Solicitation and Non-Disclosure Obligations. ....................................5

         B.    There Is A Reasonable Probability of Success on the Merits of Quest's Causes of Actions Against D'Ascoli. ......................................6

            1.    D'Ascoli Breached the Plan. ............................................ 6

            2.    D'Ascoli Breached the Implied Covenant of Good Faith and Fair Dealing. .......................................................... 8

            3.    D'Ascoli Breached His Duty of Loyalty to Quest. ......................... 9

            4.    D'Ascoli Misappropriated Confidential, Proprietary and Trade Secret Information. ........................................ 10

            5.    D'Ascoli Violated the New Jersey Trade Secrets Act. ............................... 12

            6.    D'Ascoli Engaged in Unfair Competition. .................................. 13

            7.    D'Ascoli Has Been Unjustly Enriched. ....................................... 14

         C.    The Balance of Hardships Weighs Heavily in Quest's Favor. .........................14

CONCLUSION ...................................................................................................15

## Table of Authorities

Page(s)

CASES

Alumni Ass'n of N.J. Inst. of Tech. v. N.J. Inst. of Tech.,
    2014 N.J. Super.Unpub. LEXIS 458 (Ch. Div. Feb. 28, 2014) ................................................8

AYR Composition, Inc. v. Rosenberg,
    261 N.J. Super. 495 (App. Div.1993) .......................................................................................11

Bateman v. Ford Motor Co.,
    302 F.2d 63 (3d Cir. 1962)...........................................................................................................5

Cameco, Inc. v. Gedicke,
    157 N.J. 504 (1999) .....................................................................................................................9

Canterbury Career Sch., Inc. v. Riley,
    833 F. Supp. 1097 (D.N.J. 1993) ...............................................................................................6

Chernow v. Reyes,
    239 N.J. Super. 201 (App. Div.), certif. denied, 122 N.J. 184 (1990) ....................................10

Chinetti-Garthwaite Imports v. Ferrari Societa Per Azioni Esercizio,
    463 F.Supp. 73 (E.D. Pa. 1978) ................................................................................................6

Columbia Broadcast Sys. v. Melody Recordings,
    134 N.J. Super. 368 (App. Div. 1975) .....................................................................................13

Coskey's Television & Radio Sales & Serv. v. Foti,
    253 N.J. Super. 626 (App. Div. 1992) .......................................................................................7

Crowe v. De Gioia,
    90 N.J. 126 (1982) ...................................................................................................................4, 5

Ferraiuolo v. Manno,
    1 N.J. 105 (1948) .........................................................................................................................5

In re Estate of Hirokazu Sano,
    2011 N.J. Super. Unpub. LEXIS 3049 (Ch. Div. Dec. 13, 2011)............................................14

Lamorte Burns & Co. v. Walters,
    167 N.J. 285 (2001) .........................................................................................................9, 10, 11

Maw v. Advanced Clinical Commc'ns.,
    179 N.J. 439 (2004) .....................................................................................................................7

N.J. Optometric Ass'n v. Hillman-Kohan,
    144 N.J. Super. 411 (Ch. Div. 1976) .......................................................................................13

Palisades Properties Inc. v. Brunetti,
    44 N.J. 117 (1965) ...........................................................................................8

Platinum Mgmt. Inc. v. Dahms,
    285 N.J. Super. 274 (Law. Div. 1995) ...........................................................7, 9

Professional Plan Examiners of New Jersey, Inc. v. LeFante,
    750 F.2d 282 (3d Cir. 1984)...............................................................................4

Ryan v. Carmona Bolen Home for Funerals,
    341 N.J. Super. 87 (App. Div. 2001) ...............................................................13

Rycoline Products, Inc. v. Walsh,
    334 N.J. Super. 62 (App. Div. 2000) ...............................................................11

SCS Healthcare Mktg., LLC v. Allergan USA, Inc.,
    2012 N.J. Super. Unpub. LEXIS 2704 (Ch. Div. Dec. 7, 2012)......................12

Silverstein v. ABCO Vending Service, Inc.,
    37 N.J. Super. 439 (App. Div. 1955) .................................................................5

Solari Industries Inc. v. Malady,
    55 N.J. 571 (1970) .............................................................................................7

Sons of Thunder, Inc. v. Borden, Inc.,
    148 N.J. 396 (1996) ...........................................................................................8

Subcarrier Communications, Inc. v. Day,
    299 N.J. Super. 634 (App. Div. 1997) ...............................................................4

United Board & Carton v. Britting,
    63 N.J. Super. 517 (Ch. Div. 1959), aff'd, 61 N.J. Super. 340 (App. Div. 1960), certif.
    denied, 33 N.J. 326 (1960)..................................................................................5

United States Time Corp. v. Grand Union Co.,
    64 N.J. Super. 39 (Ch. Div. 1960) .....................................................................5

VRG Corp. v. GKN Realty Corp.,
    135 N.J. 539 (1994) .........................................................................................14

West Indian Company, Ltd. v. Government of the Virgin Islands,
    812 F.2d 134 (3d Cir. 1987)...............................................................................4

Whitmeyer Bros. Inc. v. Doyle,
    58 N.J. 25 (1971) ...............................................................................................7

Zoning Bd. Of Adjustment of Sparta v. Service Elec. Cable Television of N.J., Inc.,
    198 N.J. Super. 370 (App. Div. 1985) ...............................................................4

<u>STATUTES</u>

("NJTSA"), <u>N.J.S.A.</u> 56:15-1, *et seq.* ...........................................................................................12

<u>OTHER AUTHORITIES</u>

<u>Rule</u> 4:52-1.....................................................................................................................................4

## PRELIMINARY STATEMENT

Only injunctive relief can maintain the status quo and prevent irreparable harm upon Plaintiff Quest Diagnostics Incorporated ("Quest").  Defendant Michael D'Ascoli, a former employee of Quest, violated his loyalty, non-disclosure and non-solicitation obligations by:  1) unfairly competing for Quest's Customers[1] while still employed at Quest, 2) misappropriating Quest's Confidential Information and 3) soliciting Quest Customers after he resigned from Quest.

D'Ascoli was employed by Quest as an Account Manager and Account Executive of Prescription Drug Monitoring, charged with marketing and selling toxicology products and services, among others.  D'Ascoli was given Quest Confidential Information to assist him with the marketing and selling of those products and services.  D'Ascoli signed a 2015 Sales Incentive Plan ("Plan) which contained both non-solicitation covenants and non-disclosure covenants, in which he contractually agreed to refrain from misappropriating Quest Confidential Information, and refrain from soliciting Quest Customers for a period of one (1) year after he left Quest's employment.

Despite still being employed by Quest until August 14, 2015, D'Ascoli secretly became employed with PSI Services, Inc. ("PSI") on July 6, 2015, and worked during that timeframe to unfairly compete, secretly solicit Quest Customers and misappropriate Quest Confidential Information.  PSI entered into a sales and marketing services contract wherein PSI markets and sells lab services for Sterling Healthcare OPCO, LLC, d/b/a Cordant Health Solutions ("Cordant").  Both PSI and Cordant are direct competitors of Quest.

---

[1] Capitalized terms are defined in the 2015 Sales Incentive Plan attached to Affidavit of Geoffrey S. Albrecht as Exhibit C.

After conducting an investigation subsequent to D'Ascoli's resignation, Quest discovered demonstrable breaches of his common law duty of loyalty, and his non-solicitation and non-disclosure obligations.  First, D'Ascoli violated his duty of loyalty by secretly becoming employed and joining direct competitors, PSI and Cordant, while still employed by Quest. Second, D'Ascoli actively solicited Quest Customers while still employed by Quest to join new employer PSI and for Cordant.  While still employed at Quest, D'Ascoli promised Quest Customers lower prices at PSI and Cordant, and went as far as to schedule meetings for his post-Quest employment while employed at Quest.

Second, Quest performed a computer forensic analysis of D'Ascoli's company laptop and Apple iPad after his resignation.  The results were disturbing.  D'Ascoli misappropriated Quest's Confidential Information including (i) Quest-specific and generated marketing materials (the "Marketing Materials"), (ii) Quest's **entire** book of business of customers, including every account that Quest has and what each account is worth ("Quest's Book of Business"), and (iii) Quest target strategy for obtaining new clients, including materials and reports purchased by Quest for targeting and investing in certain business areas ("Target Strategy Materials"). D'Ascoli shared this Confidential Information with PSI and Cordant.

Third, armed with Quest's Confidential Information, as well as the Quest Customers he had strategically targeted prior to his departure from Quest, D'Ascoli thereafter breached his non-solicitation obligations  by continuing to solicit Quest Customers in order to contract for toxicology services with PSI and Cordant.

Quest suffered a monetary loss as D'Ascoli lured away over $1,500,000.00 in revenue from Quest Customers on an annual basis.  However, as with most egregious restrictive covenant violations, money damages alone would never make Quest whole.  Quest would clearly suffer

2

irreparable harm if D'Ascoli is permitted to continue to possess and utilize Quest's Confidential Information where Quest's marketing strategy, target strategy and book of business is in jeopardy. The same is true for D'Ascoli's solicitation of Quest Customers. D'Ascoli's solicitation of those Customers, undercutting Quest pricing by virtue of D'Ascoli's knowledge of Confidential Information, damages Quest in the form of the lost contracts. Quest is therefore irreparably harmed. This application seeks to maintain the status quo and enjoin D'Ascoli from further breaches of his contractual obligations.

Based on D'Ascoli's misappropriation of Confidential Information in direct violation of his non-solicitation and non-disclosure obligations, Quest clearly has a reasonable probability of success on the merits on its claims for breach of contract, breach of the duty of loyalty, breach of the implied covenant of good faith and fair dealing, misappropriation of trade secrets and violation of the New Jersey Trade Secrets Act, unfair competition, and unjust enrichment. The balance of hardships also weighs in Quest's favor where it has already lost significant revenue from Quest Customers to D'Ascoli's duplicitous scheme while D'Ascoli, on the other hand, would merely have to (1) abide by his current contractual obligations for non-solicitation and non-disclosure, (2) be prevented from using unlawfully misappropriated Confidential Information. The Court should issue the injunction to prevent irreparable harm to Quest.

## STATEMENT OF FACTS

To avoid unnecessary repetition, Quest incorporates by reference all facts set forth in its Verified Complaint and Affidavit of Geoffrey S. Albrecht, Vice President of Commercial for the North Region for Quest, ("Albrecht Affidavit") submitted herewith.

3

## LEGAL ARGUMENT

### POINT I

### QUEST IS ENTITLED TO TEMPORARY, PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF.

Rule 4:52-1 states that "[o]n the filing of a complaint seeking injunctive relief, the plaintiff may apply for an order requiring the defendant to show cause why an interlocutory injunction should not be granted pending the disposition of the action." Injunctive relief is an equitable remedy granted to prevent "'some threatening, irreparable mischief, which should be averted until opportunity is afforded for a full and deliberate investigation of the case.'" Crowe v. De Gioia, 90 N.J. 126, 132 (1982) (quoting Thompson v. Paterson, 9 N.J. Eq. 624, 625 (E. & A. 1854)). A party seeking preliminary restraints must show (1) that the injunctive relief is necessary to prevent substantial, immediate and irreparable harm; (2) that there is a reasonable probability of eventual success on the merits of the plaintiff's claim; and (3) the relative hardship to the parties in granting or denying relief. See also Crowe, 90 N.J. at 132-134, affd., 102 N.J. 15 (1986); Zoning Bd. Of Adjustment of Sparta v. Service Elec. Cable Television of N.J., Inc., 198 N.J. Super. 370, 379 (App. Div. 1985); Subcarrier Communications, Inc. v. Day, 299 N.J. Super. 634, 638 (App. Div. 1997); see also, West Indian Company, Ltd. v. Government of the Virgin Islands, 812 F.2d 134, 135 (3d Cir. 1987); Accord Professional Plan Examiners of New Jersey, Inc. v. LeFante, 750 F.2d 282, 288 (3d Cir. 1984).

The New Jersey Supreme Court has declared that a "preliminary injunction should not issue except when necessary to prevent irreparable harm. Harm is generally considered irreparable in equity if it cannot be redressed adequately by monetary damages." Crowe, 90 N.J. at 133 (citing Citizens Coach Co. v. Camden Horse R. R. Co., 29 N.J. Eq. 299, 303 (E. & A. 1878)). Monetary damages may be inadequate because of the nature of the injury or the right

4

affected. Id. (citing Outdoor Sports Corp. v. A.F. of L. Local 23132, 6 N.J. 217, 229-30 (1951));

see also United Board & Carton v. Britting, 63 N.J. Super. 517 (Ch. Div. 1959), aff'd, 61 N.J.

Super. 340 (App. Div. 1960), certif. denied, 33 N.J. 326 (1960) (opining "[i]t is a well

established rule that equity will intervene to grant equitable relief when the damages at law are

inadequate, or not readily calculable.").

The Court should also take into account, when relevant, the following factors:

- The interest of preserving the *res* for litigation, and a preservation of the status quo. See University of Texas v. Camenish, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be had.")

- The possibility of harm to other interested persons from the grant or denial of the injunction. See Anderson v. Davila, 125 F.3d 148, 159 (3d Cir. 1997) (considering, among other factors, injunction's effect on interested parties).

- A weighing of the equities between the litigating parties. See Opticians Ass'n., 920 F.2d at 197 (court balancing hardships to respective parties).

Here, injunctive relief is the only vehicle to preserve the status quo and prevent

irreparable harm.

### A.   Quest Would Suffer Irreparable Harm Should the Court Not Enjoin D'Ascoli From Further Breaches of His Non Solicitation and Non-Disclosure Obligations.

Quest would suffer irreparable harm should the Court not refrain D'Ascoli from further

breaches of his non-solicitation and non-disclosure obligations.  New Jersey courts have made

clear that the loss of profits can constitute irreparable harm. See e.g. Ferraiuolo v. Manno, 1 N.J.

105, 108 (1948)("Acts destroying a complainant's business, custom and profits do an irreparable

injury and authorize the issue of a preliminary injunction."); Silverstein v. ABCO Vending

Service, Inc., 37 N.J. Super. 439, 448 (App. Div. 1955)(same); United States Time Corp. v.

Grand Union Co., 64 N.J. Super. 39, 50 (Ch. Div. 1960); See also Bateman v. Ford Motor Co.,

302 F.2d 63, 66 (3d Cir. 1962); <u>Chinetti-Garthwaite Imports v. Ferrari Societa Per Azioni</u> <u>Esercizio</u>, 463 F.Supp. 73, 75 (E.D. Pa. 1978). <u>Canterbury Career Sch., Inc. v. Riley</u>, 833 F. Supp. 1097, 1105 (D.N.J. 1993).

Here, Quest has already suffered the loss of Customers and will continue to lose Customers if D'Ascoli is not restrained from further breaches of his non-solicitation and non-disclosure obligations. Indeed, Geoffrey S. Albrecht ("Albrecht"), Vice President of Commercial for the North Region for Quest, explained that Quest has already suffered annual contract losses of $1,500,000.00 by virtue of losing Quest Customers due to D'Ascoli's solicitation breaches. <u>See</u> Albrecht Affidavit at ¶ 48. Moreover, D'Ascoli's misappropriation of Quest Confidential Information, including Marketing Materials, Quest's Book of Business and Quest Target Strategy Materials, is further damaging Quest's brand. As explained by Albrecht, the Confidential Information taken by D'Ascoli for use in his post-Quest employment can irreparably harm Quest's profits and efforts to gain additional customers and retain current customers. <u>Id.</u> at ¶¶ 10-14 and 23-36. A competitor lab could formulate their entire business and marketing model on Quest's Confidential Information and promotional materials and then undercut Quest's prices based on D'Ascoli's knowledge and disclosure of Quest's Book of Business. <u>Id.</u> It is, therefore, clear that Quest will suffer irreparable harm through the destruction of its business should D'Ascoli not be refrained further breaches of non-solicitation and non-disclosure obligations.

**B.   There Is A Reasonable Probability of Success on the Merits of Quest's Causes of Actions Against D'Ascoli.**

**1.   D'Ascoli Breached the Plan.**

First, it is clear that the Plan and its restrictive covenants are enforceable. Under New Jersey law, restrictive covenants are enforceable when they are reasonable "under all the

circumstances of the particular case." Solari Industries Inc. v. Malady, 55 N.J. 571 (1970).  A restrictive covenant will be deemed enforceable if it protects the legitimate interests of the employer, imposes no undue hardship on the employee, and is not injurious to the public.  Maw v. Advanced Clinical Commc'ns., 179 N.J. 439 (2004).

Evidence in the record shows that Quest has satisfied this test.  First, the evidence demonstrates that Quest possesses a legitimate interest in protecting its Confidential Information and business information as to client contact.  New Jersey courts have held that employers have a "patently legitimate interest in protecting . . . trade secrets as well as . . . confidential business information and . . . an equally legitimate interest in protecting . . . customer relationships." Whitmeyer Bros. Inc. v. Doyle, 58 N.J. 25, 33 (1971).  Accord Coskey's Television & Radio Sales & Serv. v. Foti, 253 N.J. Super. 626, 636-37 (App. Div. 1992); Platinum Mgmt. Inc. v. Dahms, 285 N.J. Super. 274, 294 (Law. Div. 1995).  Second, it is undisputed that D'Ascoli will not be harmed by enforcement of the restrictive covenants in the Plan since it only prohibits him from soliciting a limited class of Customers, as defined by the Plan.  Indeed, the non-solicitation provisions contained in the Plan are arguably even more reasonable, where D'Ascoli has no non-compete obligations and can work with any future employer on expanding their current customer base or expanding that customer base to non-Quest Customers.  Third, enforcement of this Plan will not be injurious to the public since the public will benefit from enforcement of reasonable restrictions.

Here, the Plan contained definitive non-solicitation and non-disclosure provisions.  See Exhibit C to the Albrecht Affidavit.  D'Ascoli has breached the Plan by (a) misappropriating Quest's Confidential Information; and (b) directly and/or indirectly soliciting Quest's Customers for his own benefit and the benefit of PSI and Cordant.  See generally Albrecht Affidavit.

D'Ascoli contacted Quest Customers and solicited them for non-Quest business. <u>Id.</u> at ¶¶ 16-22 and 37-48. In addition, D'Ascoli misappropriated and disclosed Quest Confidential Information in contravention to the non-disclosure provisions of the Plan. <u>Id.</u> at ¶¶ 10-14 and 23-36. Quest, therefore, has a reasonable probability of success of proving that D'Ascoli breached the Plan.

       **2.**       **D'Ascoli Breached the Implied Covenant of Good Faith and Fair Dealing.**

A duty of good faith and fair dealing may be implied in a contract. <u>Sons of Thunder, Inc. v. Borden, Inc.</u>, 148 <u>N.J.</u> 396 (1996). Indeed, the New Jersey Supreme Court has explained that "[i]n every contract there is an implied covenant that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract; in other words, in every contract there exists an implied covenant of good faith and fair dealing.'" <u>Palisades Properties Inc. v. Brunetti</u>, 44 <u>N.J.</u> 117, 130 (1965), quoting 5 Williston on Contracts, § 670, pp. 159-60 (3d ed.1961). Thus, the "gravamen of a violation of the covenant of good faith and fair dealing is conduct that is considered beyond the bounds of fair play and is characterized by bad faith." <u>Alumni Ass'n of N.J. Inst. of Tech. v. N.J. Inst. of Tech.</u>, 2014 N.J. Super. Unpub. LEXIS 458, *42 (Ch. Div. Feb. 28, 2014).

Here, D'Ascoli (1) surreptitiously copied, misappropriated and disclosed Quest Confidential Information, including Marketing Materials, Quest's Book of Business and Quest Target Strategy Materials, and (2) solicited Quest Customers while employed at Quest for a Quest competitor. <u>See</u> <u>generally</u> Albrecht Affidavit. Quest, therefore, has a strong likelihood of success on its breach of the implied covenant of good faith and fair dealing claim.

### 3.      D'Ascoli Breached His Duty of Loyalty to Quest.

New Jersey courts have explained that "[l]oyalty from an employee to an employer consists of certain very basic and common sense obligations. An employee must not while employed act contrary to the employer's interest." Lamorte Burns & Co. v. Walters, 167 N.J. 285, 302 (2001), citing Chernow v. Reyes, 239 N.J. Super. 201, 204, (App. Div.), certif. denied, 122 N.J. 184 (1990).  Along the same lines, it is clear therefore, that "an employee has a duty not to compete with his or her employer." Id. at 304.  While an employee enjoys the right to plan for future employment, "the employee may not breach the undivided duty of loyalty he or she owes to his or her employer while still employed by soliciting the employer's customers or engaging in other acts of secret competition." Ibid.

In Lamorte, the plaintiff employer brought suit against two former employees for, among other things, the breach of the duty of loyalty. Id. at 290.  There, the former employees had secretly gathered the plaintiff employer's customer lists and information for use post-employment as a competitive advantage to obtain those customers. Id. at 305.  The court held that the employees had violated their duty of loyalty to the plaintiff employer through such conduct. Id. Significantly, the court noted that:

> An employee's duty of loyalty to his or her employer goes beyond refraining from privately soliciting the employer's customers while still employed. The duty of loyalty prohibits the employee from taking affirmative steps to injure the employer's business.

Ibid.  As the defendants had "purloined protected information" while still employed, "for the sole purpose of effecting an advantage in competing with plaintiff," the court held that the defendants had breached their respective duties of loyalty. Ibid.; See also Cameco, Inc. v. Gedicke, 157 N.J. 504, 517-18 (1999); Platinum Mgmt., Inc. v. Dahms, 285 N.J. Super. 274, 303 (Law Div. 1995)(holding that defendant former employee breached his duty of loyalty where he provided

plaintiff employer's client information to his new employer and contacted customers on behalf of his new employer while still employed at the first company); <u>Chernow v. Reyes</u>, 239 <u>N.J. Super.</u> 201, 205 (App. Div. 1990)("By engaging in a competitive enterprise, defendant crossed the line…between permissible preparation to change jobs and actionable conduct. Plaintiff was entitled to expect that a person on his payroll would not undertake to pursue competitive commercial opportunities. The protection accorded is not limited to the diversion of an employer's customers. It extends to pursuing and transacting business within the larger pool of potential customers who might have been solicited by the employer").

Here, D'Ascoli has gone one step further than the <u>Lamorte</u> defendants.  Here, D'Ascoli solicited Quest Customers while employed at Quest for his post-Quest employment with a direct competitor.   Albrecht Affidavit at ¶¶ 16-22.   In addition, D'Ascoli purloined Quest's Confidential Information to gain the ultimate competitive advantage over Quest as a means of stealing Quest Customers.  <u>Id.</u> at 23-36.  Quest's forensic analysis of D'Ascoli's laptop and iPad demonstrates his stealth, surreptitious conduct to undermine and undercut Quest's business model and profits.  <u>Id.</u>  As there could not be a clearer case of the breach of duty of loyalty, Quest clearly has demonstrated a likelihood of success on the merits.

>    **4.    D'Ascoli Misappropriated Confidential, Proprietary and Trade Secret Information.**

To prevail on a claim for misappropriation of a trade secret, a plaintiff must prove

> (1) a trade secret exists; (2) the information comprising the trade secret was communicated in confidence by plaintiff to the employee; (3) the secret information was disclosed by that employee and in breach of that confidence; (4) the secret information was acquired by a competitor with knowledge of the employee's breach of confidence; (5) the secret information was used by the competitor to the detriment of plaintiff; and (6) the plaintiff took precautions to maintain the secrecy of the trade secret.

Rycoline Products, Inc. v. Walsh, 334 N.J. Super. 62, 71 (App. Div. 2000).

New Jersey courts have long recognized that an entities' customer list, or book of business, constitutes a trade secret and have been afforded protection as such. See AYR Composition, Inc. v. Rosenberg, 261 N.J. Super. 495, 504 (App. Div.1993) ("Where a service company is concerned, the names and addresses of its customers 'are not open to and ascertainable by everyone; they are private information and property' of company."); See also Lamorte, supra, 167 N.J. at 298. The law similarly protects confidential and proprietary information of corporations that does not rise to the level of a trade secret. LaMorte, 167 N.J. at 298 ("information need not rise to the level of a trade secret to be protected... The key to determining the misuse of information is the relationship of the parties at the time of disclosure and the intended use of the information").

Here, Quest communicated the Confidential Information to Quest employees, including D'Ascoli in confidence and has gone to great lengths to keep such information confidential. Albrecht Affidavit at ¶¶ 10-14 and 23-36. Quest's confidential and proprietary information derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other people who can obtain economic value from it. Id. Quest has taken substantial efforts, reasonable under the circumstances, to maintain the secrecy of such information. Id.

D'Ascoli surreptitiously emailed Quest Confidential Information, including Marketing Materials, Quest's Book of Business, and Quest Target Strategy Materials, to his personal email for the use in his future employment with Quest competitors. Id. D'Ascoli's actions are made even more egregious by two facts uncovered in the forensic analysis; (1) that he previously attempted to access and misappropriate the same information through the use of an unauthorized

11

USB flash drive just prior to the termination of his employment, and (2) the fact that he deleted the emails and attachments after sending them in an obvious, but unsuccessful attempt to cover his tracks.  Id.  It appears that D'Ascoli has made this information available to competitors of Quest, and Quest has lost Customers to the competitors as a result.  Id.  Quest, therefore, has a strong likelihood of success on the merits as D'Ascoli's conduct was a clear misappropriation of Quest's confidential, proprietary and trade secret information.

     **5.**     **D'Ascoli Violated the New Jersey Trade Secrets Act.**

The New Jersey Trade Secrets Act ("NJTSA"), N.J.S.A. 56:15-1, *et seq*. defines "trade secret" as:

> information, held by one or more people, without regard to form, including a formula, pattern, business data compilation, program, device, method, technique, design, diagram, drawing, invention, plan, procedure, prototype or process, that: (1) derives independent economic value, actual or potential, form not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) is the subject of effects that are reasonable under the circumstances to maintain its secrecy."
> N.J.S.A. 56:15-2.

As set forth more fully above, Quest has adequately demonstrated a likelihood of success on the merits that D'Ascoli misappropriated Quest trade secrets.  Quest, therefore, has demonstrated a likelihood of success on D'Ascoli's violation of the NJTSA.[2]

---

[2]  It is significant to note that a New Jersey court has found that the NJTSA does not preempt common law claims for misappropriation of trade secrets.  See SCS Healthcare Mktg., LLC v. Allergan USA, Inc., 2012 N.J. Super. Unpub. LEXIS 2704, *17-19 (Ch. Div. Dec. 7, 2012)("[The] statutory scheme reflects the legislature's intent that the rights and remedies afforded under the Trade Secrets Act be cumulative, rather than restrictive, of the rights and remedies provided under the common law.").

6.     **D'Ascoli Engaged in Unfair Competition.**

Quest has a reasonable likelihood of success on the merits of its unfair competition claim. New Jersey courts are clear that the essence of an unfair competition claim is "fair play." Columbia Broadcast Sys. v. Melody Recordings, 134 N.J. Super. 368, 376 (App. Div. 1975). The concept is the promote higher ethical standards in the business world and therefore, the cause of action is "flexible and elastic as the evolving standards of commercial morality demand." N.J. Optometric Ass'n v. Hillman-Kohan, 144 N.J. Super. 411, 427 (Ch. Div. 1976). "The judicial goal should be to discourage, or prohibit the use of misleading or deceptive practices which renders competition unfair. The law must be sufficiently flexible to accommodate those goals." Ryan v. Carmona Bolen Home for Funerals, 341 N.J. Super. 87, 92 (App. Div. 2001).

Here, D'Ascoli contacted and solicited customers on behalf of PSI and Cordant while still employed at Quest.  Albrecht Affidavit at ¶¶ 16-22.  D'Ascoli surreptitiously emailed (after previously twice attempting to access the materials through a Quest-prohibited USB device) Quest Confidential Materials, including Quest specific Marketing Materials, Quest's Book of Business and Quest Target Strategy Materials to a private email address for the purpose of obtaining contracts with Quest customers. Id. at 10-14 and 23-36. It is clear that  D'Ascoli has engaged in a duplicitous scheme to undercut Quest pricing through the misappropriation of Quest Confidential Information and solicitation of Quest Customers to the detriment of Quest. Such conduct is clearly the opposite of "fair play."  Therefore, where D'Ascoli has engaged in a scheme to steal Quest Customers through the use of pirated information, including Quest's entire book of business, as well as its materials to market and target customers, Quest has amply demonstrated a likelihood of success on its unfair competition claim.

7.    **D'Ascoli Has Been Unjustly Enriched.**

New Jersey courts define a cause of action for unjust enrichment to be a situation where a "defendant received a benefit and that retention of that benefit without payment would be unjust." In re Estate of Hirokazu Sano, 2011 N.J. Super. Unpub. LEXIS 3049 (Ch. Div. Dec. 13, 2011); See also VRG Corp. v. GKN Realty Corp., 135 N.J. 539, 554 (1994).

Here, as set forth more fully above, D'Ascoli has been conferred a benefit and unjustly enriched in the form of income resulting from toxicology contracts with Quest Customers and potential customers. Albrecht Affidavit at ¶¶ 16-22 and 37-48. D'Ascoli received this benefit by virtue of his wrongful conduct. Id. Quest, therefore, has a reasonable likelihood of success on the merits of its unjust enrichment claim.

**C.    The Balance of Hardships Weighs Heavily in Quest's Favor.**

The balance of hardships clearly weighs heavily in Quest's favor. As detailed in Section A, infra, without the injunction, Quest would continue to suffer the loss of critical toxicology contracts. Albrecht Affidavit at ¶¶ 16-22 and 37-48. Quest has already suffered the loss of approximately $1,500,00.00 in annual contracts in a mere two months post-employment for D'Ascoli. Id. at 48. Moreover, D'Ascoli's continued disclosure of Quest Confidential Information undercuts Quest's marketing and targeting efforts and further undermines Quest's Book of Business. Id. at 10-14 and 23-36. Should D'Ascoli continue to violate his non-solicit and non-disclosure obligations, Quest would irreparably harmed.

D'Ascoli, on the other hand, would suffer no hardship should the injunction issue as the status quo would remain the same. D'Ascoli could continue working with his new employer on their non-Quest customers which he is required to do in any event by virtue of the non-solicitation provisions in the Plan. As the balance of hardships clearly weighs in Quest's favor, the Court should enter the injunction to preserve the status quo and to prevent the potential

14

destruction of Quest's business and profits through D'Ascoli's continued violation of his non-solicitation and non-disclosure obligations.

## CONCLUSION

Based on the foregoing, Quest respectfully requests that the Court grant the injunctive and equitable relief requested and enter the proposed Order to Show Cause submitted herewith.

Respectfully submitted,

By: _____
Michael T. Hensley, Esq.
Attorneys for Plaintiff
Quest Diagnostics Incorporated

Dated: November 3 , 2015

15

MICHAEL T. HENSLEY, Id. No. 031952001
BRESSLER, AMERY & ROSS
A Professional Corporation
325 Columbia Turnpike
Florham Park, New Jersey 07932
P.O. Box 1980
Morristown, New Jersey 07962
(973) 514-1200
Attorneys for Plaintiff
Quest Diagnostics Incorporated

|  |  |
|---|---|
| QUEST DIAGNOSTICS INCORPORATED,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL D'ASCOLI,<br><br>Defendant. | SUPERIOR COURT OF NEW JERSEY<br>CHANCERY DIVISION –<br>GENERAL EQUITY<br>MORRIS COUNTY<br>DOCKET NO: C- *151-15*<br><br>Civil Action<br><br>**AFFIDAVIT OF<br>GEOFFREY S. ALBRECHT** |

STATE OF PENNSYLVANIA:
             : SS:
COUNTY OF ALLEGHENY :

      Geoffrey S. Albrecht, duly sworn, hereby states the following:

      1.    I am the Vice President of Commercial for the North Region for Plaintiff Quest Diagnostics Incorporated ("Quest"). I am fully familiar with the facts set forth herein and in the Verified Complaint filed by Plaintiff Quest. I submit this Affidavit in support of Plaintiff's application for Temporary, Preliminary and Permanent Injunctive Relief against Defendant Michael D'Ascoli ("D'Ascoli").

      2.    In or around September 2010, D'Ascoli was offered, and thereafter accepted employment with Quest as an Account Manager within Quest's Wallingford Business Unit in Wallingford, Connecticut.

3.      D'Ascoli's job duties were selling the Quest portfolio of laboratory testing solutions to physicians and providers.

4.      In conjunction with his employment, D'Ascoli entered into an Account Manager Sales Compensation Plan with Quest which contained, among other things, non-solicitation and non-disclosure provisions.   A true and accurate copy of the Account Manager Sales Compensation Plan is attached hereto as **Exhibit A**.

5.      On or about February 2012, D'Ascoli was offered a promotion from an Account Manager to an Account Executive for Prescription Drug Monitoring at Quest.

6.      D'Ascoli's duties in this new position included selling prescription drug testing and toxicology testing solutions to providers and hospitals.

7.      On or about February 9, 2012, D'Ascoli accepted the promotion to Account Executive and further acknowledged his non-solicitation and non-disclosure obligations to Quest.  A true and accurate copy of D'Ascoli's Acceptance of Promotion with Non-Solicitation Provision is attached hereto as **Exhibit B**.

8.      D'Ascoli was offered and accepted a sales compensation plan every year, including 2015, which contained non-solicitation and non-disclosure provisions.  A true and accurate copy of the 2015 Sales Incentive Plan for Prescription Drug Account Executives ("Plan") is attached hereto as **Exhibit C** (which was electronically signed – screenshots of the e-signature are available).

9.      The Plan contained numerous provisions relevant to this lawsuit.  The Plan states, in part:

> I acknowledge and agree that in my capacity as a PDM Account Executive, I have had and continue to have non-solicitation and non-disclosure obligations to the Company [Quest].
> * * *

2

For a period of one (1) year following the date my employment is terminated, for any reason, I will not contact or solicit, whether directly or indirectly, any Customer of the Company for the purpose of selling or providing Competitive Services. For purposes of this Agreement, "Competitive Services" shall refer to products or services that I sold on behalf of the Company during the twelve (12) month period immediately proceeding the termination of my employment. For purposes of this Agreement, "Customer" shall refer to any person or entity to which I, within the twelve (12) months immediately preceding my termination, on behalf of the Company, sold Competitive Services or made a proposal to sell Competitive Services.

* * *

I agree that while employed by Quest Diagnostics and subsequent to such employment, I shall not, for any purpose whatsoever, use, divulge, or disclose to any person or entity any Confidential Information which I have obtained as a result of my association with Quest Diagnostics, and further agree that I shall not in any way make use of any Confidential Information pertaining to Quest Diagnostics' activities or business .  .  . For purposes of this Agreement, "Confidential Information" means Company information not generally known to the public, including, but is not limited to, business plans, formulas, processes, methods of manufacture, machines, compositions, lists of customers, sales or marketing manuals, strategies, special price tables or schedules, inventions of the Company or any of the Company's affiliates. Id.

10.     Quest has gone to great expense and effort to develop and maintain its Customer[1] relationships and to compile its Confidential Information and Competitive Services.

11.     These expenditures and efforts include, but are not limited to, developing a business plan, developing a compensation structure, budgets, labor and other costs, marketing materials, profit margins, training personnel and developing an infrastructure to develop and continue to service Customers.

12.     The Confidential Information developed and compiled through Quest's efforts is not readily available to its competitors.

---

[1] Capitalized terms are defined in the Plan.

13.     During the course of his employment with Quest, D'Ascoli acquired, and otherwise obtained, access to a wide range of Confidential Information based upon his agreement to preserve the confidentiality of such Confidential Information.  The Confidential Information is unique to Quest and is critical to its operations and business including competing with others in this limited and specialized market.

14.     At all times, Quest took reasonable precautions to protect its Confidential Information from disclosure to the public and has invested substantial resources in the development and retention of its Customers.

15.     D'Ascoli voluntarily resigned from his employment with Quest on July 31, 2015, and his last day working for Quest was August 14, 2015.

**A.     D'Ascoli Secretly Competed and Solicited Customers for His Post-Quest Employment While Employed at Quest**

16.     Prior to D'Ascoli's resignation, he engaged in multiple instances of misconduct, unfair competition, and breaches of his duty of loyalty,  including soliciting Customers to advise them of his departure from Quest in the hopes of usurping their business for his post-Quest employment.

17.     Despite being still employed by Quest until August 14, 2015, D'Ascoli secretly became employed with PSI on July 6, 2015, and worked during that timeframe to unfairly compete, secretly solicit Quest Customers and misappropriate Quest Confidential Information. A true and accurate copy of a letter from counsel for PSI is attached hereto as **Exhibit D**.

18.     For example, on July 29, 2015, in anticipation of his resignation from Quest (but while still employed by Quest), D'Ascoli emailed Quest Customer Wellmore Behavioral Health ("Wellmore") requesting that the Customer meet with him in the coming weeks to discuss the Customer's services.  A true and accurate copy of D'Ascoli's July 29, 2015 e-mail to Wellmore

4

is attached hereto as **Exhibit E**.  D'Ascoli was still employed by Quest on July 29, but was secretly also employed by PSI and soliciting Wellmore.

19.     This contact, while still employed by Quest, is an unmistakable breach and improper solicitation.

20.     D'Ascoli contacted other Quest Customers while employed at Quest to solicit business for his post-Quest employment, including The Connection, MCCA and Waynik Group.

21.     D'Ascoli has significant knowledge of Quest's business practices, strategies, and pricing lists and used that to his advantage by communicating to Quest Customers that he would be able to offer them lower rates at his new employer.

22.     PSI entered into a sales and marketing contract with another Quest competitor, Sterling Heathcare OPCO, LLC d/b/a Cordant Health Solutions ("Cordant"). D'Ascoli solicited Quest Customers on behalf of PSI and Cordant.

### B.     D'Ascoli Misappropriated Quest's Confidential, Proprietary and Sensitive Information

23.     On or about August 21, 2015, Quest had a forensic analysis conducted on D'Ascoli's Quest laptop computer and Apple iPad that he returned to Quest once he resigned.

24.     The forensic analysis revealed that D'Ascoli misappropriated highly confidential, proprietary and sensitive information and documents where D'Ascoli, among other things, e-mailed voluminous highly sensitive Confidential Information to his private e-mail address immediately prior to leaving the employment of Quest.

25.     The misappropriation is made even more egregious where the forensic analysis further revealed that D'Ascoli made a previous attempt to access Quest's Confidential Information through the use of a USB Device, but was unsuccessful.

26.     On July 9, 2015, three (3) days after becoming secretly employed by PSI, D'Ascoli connected a mass storage device in the form of a USB device to his computer in an attempt to improperly copy Quest's Confidential Information.

27.     On July 28, 2015, three (3) days prior to his resignation, D'Ascoli again connected a mass storage device in the form of a USB Device to his computer in an attempt to improperly copy Quest's Confidential Information.

28.     Quest's policies prohibit the connection and use of USB Devices to Quest computers, and instead requires Quest-specific encrypted flash drives for access.

29.     Quest's computers have safeguards that prevent the use of personal USB Devices and D'Ascoli was therefore unsuccessful in his July 9 and July 28 attempts to improperly misappropriate Quest's Confidential Information.

30.     D'Ascoli thereafter successfully misappropriated Quest's Confidential Information on August 3, 2015, three (3) days after he tendered resignation to Quest, by e-mailing nineteen (19) communications from his Quest account to his personal email account.

31.     The nineteen (19) communications included nineteen (19) attachments, which contained the following documents:

1. IMS Report (Annualized Prescription Data)
2. Why Quest for Drug Monitoring?
3. Why Rx Drug Monitoring?
4. CIGNA PDM Targets
5. DAP Testing Clients
6. DAP Testing Clients (Print File)
7. IMS Edit (Prescription Level Data)
8. IMS Tox Data (Annualized Prescription Data)
9. Millennium (Clients Using Same)
10. PDM High Rx
11. PDM High Rx PDM Targets CT
12. PDM Targets CT
13. PDM Terr. (Percentage of Quest PDM Business in Territory)
14. PDM Tops 2015

15. PDM-TOX Opps
16. Rehab Programs
17. Update to Why Rx Drug Monitoring?
18. Wallingford PDM – Rehab Opps
19. Why Rx Drug Monitoring

32.     The nineteen (19) attachments contained three categories of Quest's Confidential Information, including (i) Quest-specific and generated marketing materials (the "Marketing Materials"), (ii) Quest's entire book of business of Customers, including every account that Quest has and what each account is worth ("Quest's Book of Business"), and (iii) Quest target strategy for obtaining new Customers, including materials and reports purchased by Quest for targeting and investing in certain business areas ("Target Strategy Materials").

33.     The Marketing Materials included Quest promotional documents and marketing messages that were geared towards educating Customers on why they should choose Quest for their needs.  The Marketing Materials are proprietary to Quest and their production to another laboratory could permit that laboratory to create their entire marking department based on Quest's materials.

34.     Quest's Book of Business provides information on every Quest account in the region, including what they are worth on a monthly and annual revenue basis.

35.     The forensic analysis further demonstrated that after improperly forwarding Quest's Confidential Information, D'Ascoli deleted all e-mails and relevant attachments in an attempt to cover his tracks and prevent Quest from learning about his unlawful conduct.

36.     D'Ascoli shared this Confidential Information with PSI and Cordant.

**C. D'Ascoli's Unlawful Conduct After His Resignation from Quest**

37.     D'Ascoli's employment with PSI involved marketing and selling PSI and Cordant's products and services.

38.     PSI and Cordant are direct competitors of Quest, and engaged in the business of providing toxicology services to medical providers.

39.     Since becoming employed by PSI, and on behalf of Cordant, D'Ascoli has directly and indirectly solicited Quest Customers, and has utilized Quest's Confidential Information, all in direct violation of the Plan.

40.     Quest has obtained evidence of D'Ascoli improper solicitations with Quest's Customers.

41.     On or about June 23, 2015, while secretly employed by PSI working on behalf of Cordant, D'Ascoli attended a meeting with a Quest representative at The Connection, a Quest Customer.  When the Customer requested lower pricing, D'Ascoli indicated he would be in contact with them shortly regarding reduced pricing.  A couple of days later D'Ascoli resigned, D'Ascoli solicited The Connection offered lower pricing, while obviously knowing Quest's strategic pricing.  Thereafter, The Connection terminated its contract for toxicology services with Quest, and became a customer of Cordant through D'Ascoli and PSI.  This improper solicitation was in breach of his restrictive covenants and damages Quest in the amount of $80,000 to $100,000 *per month* on this one account alone.

42.     Further, in or about August or September 2015, D'Ascoli solicited business from ECHN Behavioral Health ("ECHN") by scheduling a meeting with ECHN Behavioral Health personnel.

43.     ECHN communicated to D'Ascoli that they were seeking to enter into a contract with Quest for certain toxicology services.

44.     D'Ascoli scheduled the meeting, but failed to notify ECHN that he was no longer employed by Quest.

45.     Only at the meeting with ECHN did D'Ascoli notify them that he was no longer working with Quest, and instead tried to sell them services from a competitor laboratory.

46.     D'Ascoli has continued to hold himself out as a Quest employee, even listing himself as currently employed at Quest on his LinkedIn page. A true and accurate copy of his October 31, 2015 LinkedIn profile is attached hereto as **Exhibit F**.

47.     Since D'Ascoli's resignation, he has solicited business from the following Quest customers; (i) The Connection, (ii) Project Courage, (iii) New Solutions Pain, (iv) The Children's Center, and (v) CHR Enfield, (vi) Catholic Charities, (vii) Wellmore, and (viii) McCall Foundation.   D'Ascoli conceded to these contacts.

48.     Since D'Ascoli's resignation, he has solicited and accepted business from the following Quest customers (i) The Connection, (ii) Project Courage, (iii) New Solutions Pain, and (iv) The Children's Center.   D'Ascoli conceded to these contacts.   Quest's lost annual revenue on these customers exceeds $1,500,000.00.

49.     By letter dated August 31, 2015, Quest reminded D'Ascoli of the Plan and his non-solicitation and non-disclosure obligations thereunder. A true and accurate copy of Quest's August 31, 2015 letter to D'Ascoli is attached hereto as **Exhibit G**. Quest further notified Cordant and PSI.

50.     As a result of the forensic analysis and information provided by Quest Customers that D'Ascoli was soliciting their business, on October 15, 2015, Quest demanded by letter that D'Ascoli cease and desist from, among other things, unlawfully soliciting Quest's Customers in violation of the Plan. A true and accurate copy of Quest's October 15, 2015 cease and desist letter to D'Ascoli is attached hereto as **Exhibit H**. Quest further notified Cordant and PSI.

51.     Based on the forensic analysis demonstrating that D'Ascoli improperly misappropriated Quest's Confidential Information, Quest further demanded that D'Ascoli, among other things, provide a detailed accounting and return to Quest originals and copies of any Confidential Information belonging to Quest and the identity of any person that D'Ascoli shared the information with and the method by which he shared it.

52.     D'Ascoli has financially benefitted from his breach of the Plan.

53.     A temporary restraining order and injunction is necessary to attempt to preserve the status quo and prevent further harm to Quest.  As set forth above, the harm to Quest is irreparable and cannot be quantified in just monetary terms.

Sworn to and subscribed before me
this 3rd day of  November , 2015.

*Victoria Stephens*
Notary Public ~ State of Pennsylvania

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Victoria Stephens, Notary Public
Green Tree Boro, Allegheny County
My Commission Expires March 20, 2016
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

## CERTIFICATION OF COPY SIGNATURE

I, Michael T. Hensley, Esq., of full age, certify as follows:

a)      I am an attorney-at-law of the State of New Jersey and a Principal of the firm of Bressler, Amery & Ross, P.C., attorneys for Plaintiff Quest Diagnostics Incorporated in the within action.

b)      The Affidavit of Geoffrey S. Albrecht submitted herewith contains a copy signature.

c)      Mr. Albrecht has acknowledged that his signature as it appears on his Affidavit is genuine.  A copy of the Affidavit of Geoffrey S. Albrecht with original signature pages affixed thereto will be filed with the Court if requested by the Court or any party.

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

_____
Michael T. Hensley

Dated:  November 3, 2015

2860735_1

Exhibit A



# *2010*
# *Sales Compensation Plan*

## *Account Manager (AM)*

# 20.. Sales Compensation Pla..
## Account Manager

### 20.. SALES COMPENSATION PLAN

- The Account Manager's 2010 sales compensation plan includes two components:
  1. Base Salary
  2. Variable Sales Compensation

- This Plan document describes the **Variable Sales Compensation** component.

> **Quest Diagnostics reserves the right to amend, modify, or terminate this Plan at any time.**

### PLAN PARTICIPATION ELIGIBILITY

- You are eligible to participate in this Plan if you are an Account Manager for Quest Diagnostics and are not participating in any other Company incentive plan.

- Specific employment restrictions related to variable sales compensation are as follows, except if otherwise required by applicable State law:

  1. **Commencement of Employment**
     - You must start work in your territory before the 15th of the month to be eligible for variable sales compensation for that month (a.k.a. "eligible month").
     - Your quarterly variable sales compensation payment will be prorated based on the number of eligible months in that quarter in which you are assigned to the territory.

  2. **Termination of Employment**
     The following rules apply to all terminations (involuntary or voluntary) unless you are eligible for benefits under the Company's severance plan. The rules also apply if you transfer out of this role (via promotion or other job change).
     - You will receive a pro-rata share of any earned variable sales compensation if you leave your position for any reason (e.g. transfer, promotion, termination) calculated from the beginning of the quarter and rounded to the nearest whole month based on Sales ID termination procedures (incorporated herein by reference). This payment will be the last incentive payment and shall be paid on the date that the variable sales compensation for that quarter is paid to all active employees, unless state law requires earlier payment.

### VARIABLE SALES COMPENSATION ELEMENTS

**General Provisions**

**Sales Management in conjunction with Finance Management is responsible for implementing control processes for sales activity identified by the Account Manager ensuring compliance with Company policies and procedures. Through review and signature of this document, it is acknowledged that failure to comply with policies and controls to administer the plan may result in reduced, or forfeiture of, variable compensation payments.**

---

2010 Sales Compensation Plan - Account Manager

---

This Policy document and its terms are proprietary and confidential and are subject to the Company's policy concerning the protection of confidential information.

# 20_ _ Sales Compensation Pla_ _
## Account Manager

- **Net Revenue** is defined as Gross Revenue less sales adjustments and estimated disallowances.

- **Total Attainment** – Adjusted base business plus New Sales productivity

**Actual Results**
- Your quarterly Total Attainment results will include all eligible net revenue from accounts personally sold and/or serviced by you and located within your defined sales territory.
- There will be a reduction in eligible net revenue from your actual results for the placement of (offensive) in-office Phlebotomists (IOP's) for new sales and total attainment. Specific amounts and applicable rules will be covered in a separate SOP document from Revenue Management (incorporated herein by reference).

**Calculation of Payments**
- Compensation awards are earned when the sale is billed.
- Any payments under this plan will be made quarterly.
- Award payments (as described in the next sections) will be based, either in whole or in part, on your Total Attainment results at the end of each quarter.
- Your Total Attainment is calculated by dividing your **actual** book of business by your **budgeted** book of business for each quarter.

## Total Attainment Bonus Award

- A bonus will be paid for achievement of at least 93% Total Attainment each quarter.
- The actual bonus payout will be based on the table below:

| Quarterly Total Attainment | Quarterly Bonus |
|---|---|
| Less than 93% | $     0 |
| 93% – 94% | $   875 |
| 95% | $ 1,750 |
| 96% | $ 3,150 |
| 97% | $ 4,550 |
| 98% | $ 5,950 |
| 99% | $ 7,350 |
| 100% | $ 8,750 |

**Your Total Attainment will be rounded to the nearest whole percentage point.**

2010 Sales Compensation Plan - Account Manager

This Policy document and its terms are proprietary and confidential and are subject to the Company's policy concerning the protection of confidential information.

# 20.. Sales Compensation Pla..
## Account Manager
**Example:**                    **100.4% = 100% = $8,750**

*If you achieve quarterly total attainment of 101% or better, the bonus award will increase to $10,000. In addition, you will receive a percentage of the dollars in excess of your total attainment goal. This percentage will be based on BOTH your quarterly total attainment percent AND the dollar amount by which you exceed your total attainment goal:*

*Quarterly Total Attainment*

| Actual Net Revenue in Excess of Budget | 11% - 114% | 115% - 124% | 115%+ |
|---|---|---|---|
| < $50,000 | 3.0% | 3.5% | 4.0% |
| $50,000 - $99,999 | 3.5% | 4.0% | 4.5% |
| $100,000 - $199,999 | 4.0% | 4.5% | 5.0% |
| $200,000 or greater | 4.5% | 5.0% | 7.0% |

- ◆ EXAMPLE (quarterly):

| | |
|---|---|
| Budgeted Book of Business: | $1,500,000 |
| Actual Book of Business: | $1,650,000 |
| Total Attainment: | 110% |
| $$ Amount in Excess of Plan: | $150,000 |
| Bonus for Hitting 101% to plan: | $10,000 |
| % applied to dollars in excess of goal: | 4.5% |
| Additional Bonus Amount: $150,000 x 4.5% | $6,750 |
| Total Award for Quarter: | $16,750 |

This Policy document and its terms are proprietary and confidential and are subject to the Company's policy concerning the protection of confidential information.

## 20__ Sales Compensation Pla__
### Account Manager

**SECTION 409A**

The plan is intended to be exempt from the requirements of Section 409A of the Internal Revenue Code of 1986, as amended, and Quest Diagnostics will administer the plan consistent with such intent.

**DISPUTES**

Any disputes regarding the terms of the Plan, its application, or administration will be addressed in the following manner:

You should discuss any disputes with your immediate supervisor. If you do not receive an answer in a reasonable time period, or if the answer is unsatisfactory, you should contact the Sales Director or your Human Resources Director. If you do not agree with the decision at this level you should contact your Regional Sales Vice President. If a problem remains unresolved, you may request that the problem be addressed by the Vice President of Sales & Marketing or his/her designee. This is the final step in the process.

**ACKNOWLEDGEMENT OF UNDERSTANDING**

I acknowledge that I have received a copy of the 2010 Sales Compensation Plan for Account Managers. By signing this Acknowledgement, I agree to the terms and conditions as stated in the Plan, corresponding policies and procedures, and understand that this Plan, as modified from time to time by the Company, supersedes any and all previous plans, policies, and oral or written understandings regarding commissions, bonuses, and pay structures.

I acknowledge that the Company reserves the right to amend, modify or terminate any or all provisions within this Plan, at any time, with or without notice, at its sole discretion. The Regional Sales VP in concert with the Sales Director shall have sole discretion to interpret and administer Plan provisions.

I acknowledge that in my capacity as an Account Manager, I have had and continue to have non-solicitation and non-disclosure obligations to the Company. These obligations are as follows. For a period of one (1) year from the date my employment is terminated for any reason, I will not directly or indirectly solicit the business of any customer of the Company of whom I acquired knowledge and/or had direct or indirect contact during the term of my employment for any purpose. For a period of one (1) year from the date my employment is terminated for any reason, I will not, directly or indirectly, recruit or solicit any employees of the Company to work for me or any other person or entity. Finally, I will not divulge to anyone at any time any proprietary, confidential or trade secret information acquired by me concerning the Company or any of its affiliates' businesses. Such information includes, but is not limited to, business plans, formulas, processes, methods of manufacture, machines, compositions, lists of customers, sales or marketing manuals, strategies, special price tables or schedules, inventions of the Company or any of the Company's affiliates.

I agree to utilize the Dispute provision of this Plan in the event that I have any disagreement with the Company over the terms of this Plan.

I understand that my signature below does not imply that there is an employment contract between myself and the Company and in no way guarantees employment with the Company for any length of time.

2010 Sales Compensation Plan - Account Manager

This Policy document and its terms are proprietary and confidential and are subject to the Company's policy concerning the protection of confidential information.

5

## 20__ Sales Compensation Plan
## Account Manager

_Mike DAScoLi_
**Account Manager (Print)**

_MDAM_            10/4/10
**Account Manager's Signature**          **Date**

This Policy document and its terms are proprietary and confidential and are subject to the Company's policy concerning the protection of confidential information.

6

Exhibit B

# 2012 Sales Compensation Plan
## Prescription Drug Monitoring Account Executive

### ACKNOWLEDGEMENT OF UNDERSTANDING

I acknowledge that I have received a copy of the 2012 Sales Compensation Plan for Prescription Drug Monitoring Account Executives. By signing this Acknowledgement, I agree to the terms and conditions as stated in the Plan, corresponding policies and procedures, and understand that this Plan, as modified from time to time by the Company, supersedes any and all previous plans, policies, and oral or written understandings regarding commissions, bonuses, and pay structures.

I acknowledge that the Company reserves the right to amend, modify or terminate any or all provisions within this Plan, at any time, with or without notice, at its sole discretion. The Regional Sales VP in concert with the Sales Director shall have sole discretion to interpret and administer Plan provisions.

I acknowledge that in my capacity as a Prescription Drug Monitoring Account Executive, I have had and continue to have non-solicitation and non-disclosure obligations to the Company. These obligations are as follows. For a period of one (1) year from the date my employment is terminated for any reason, I will not directly or indirectly solicit the business of any customer of the Company of whom I acquired knowledge and/or had direct or indirect contact during the term of my employment for any purpose. For a period of one (1) year from the date my employment is terminated for any reason, I will not, directly or indirectly, recruit or solicit any employees of the Company to work for me or any other person or entity. Finally, I will not divulge to anyone at any time any proprietary, confidential or trade secret information acquired by me concerning the Company or any of its affiliates' businesses. Such information includes, but is not limited to, business plans, formulas, processes, methods of manufacture, machines, compositions, lists of customers, sales or marketing manuals, strategies, special price tables or schedules, inventions of the Company or any of the Company's affiliates.

I agree to utilize the Dispute provision of this Plan in the event that I have any disagreement with the Company over the terms of this Plan.

I understand that my signature below does not imply that there is an employment contract between myself and the Company and in no way guarantees employment with the Company for any length of time.

I further acknowledge and agree that the Company may withhold payment of any amount pursuant to this plan for a breach of the preceding obligations.

Mike D'Ascol.                                              3/2/12
Prescription Drug Monitoring Account Executive's Name (Print)        Date

                                                           3/2/12
Prescription Drug Monitoring Account Executive's Signature          Date

---

2012 Sales Compensation Plan – Account Executive (PDM-AE)

This Policy document and its terms are proprietary and confidential and are subject to the Company's policy concerning the protection of confidential information.

Exhibit C

# *2015*
# *Sales Incentive Plan*

# *PDM Account Executive*
# *(PDM-AE)*

Quest Diagnostics reserves the right to amend, modify, or terminate this Plan in its sole discretion at any time. This document contains certain terms and conditions governing your eligibility for variable sales incentive and is not a contract of employment. You are an at-will employee and your employment may be terminated at any time with or without cause by you or the Company.

# 2015 Sales Incentive Plan
## PDM Account Executive

## 2015 SALES INCENTIVE PLAN

- ♦ The PDM - Account Executive's 2015 sales compensation includes two components:
  1. Base Salary
  2. Sales Incentive Plan (SIP)  (Target payout $48,000) – *Described in this document*

## PLAN PARTICIPATION / ELIGIBILITY

- ♦ You are eligible to participate in this Plan if you are a PDM - Account Executive for Quest Diagnostics, are not participating in any other Company incentive plan, and have acknowledged and signed this Plan.

- ♦ General Provision of SIP:  Sales Management in conjunction with Finance Management is responsible for implementing control processes for proper approval of sales identified by the PDM - Account Executive ensuring compliance with Company policies and procedures.  Through review and signature of this document, it is acknowledged that failure to comply with policies and controls to administer the plan may result in reduced, or forfeiture of, SIP payments.

- ♦ You must be actively employed as follows to be eligible to earn SIP payments, except as otherwise required by applicable State law:
  1. **Commencement in applicable sales role**
     - ♦ You must start work in your territory before the 15th of the month to be eligible for SIP payments for that month (a.k.a. "eligible month").
  2. **Separation from applicable sales role**
     The following rules apply to all terminations unless you are eligible to separate under the Company's Severance Plan, as amended from time to time.  The rules also apply if you transfer out of this role (via promotion or other job change).
     - ♦ You will receive a pro-rata share of any earned variable sales incentive if you leave your position for any reason (e.g. transfer, promotion, termination – including disability, death or retirement) calculated from the beginning of the quarter and rounded to the nearest whole month based on Sales ID termination procedures (incorporated herein by reference).  This payment will be the final variable sales incentive payment due to the eligible employee based on separation from employment in the position and shall be paid as soon as administratively feasible, but in any event no later than the date that the variable sales incentive for that quarter is paid to all active employees, unless otherwise required by state law.
     - ♦ Notwithstanding the foregoing, you must be employed by Quest Diagnostics to earn any variable sales incentive, and you may not earn variable sales incentive after your employment or assignment to the eligible position has terminated, regardless of the reason for termination.

---

2015 Sales Incentive Plan – PDM - Account Executive

This Policy document and its terms are proprietary and confidential and are subject to the Company's policy concerning the protection of confidential information.

# 2015 Sales Incentive Plan
## PDM Account Executive

## Definitions:

- **Net Product Revenue** is defined as the most recent 3 month payer based CPT cash remittance applied at the test level. It is utilized for the Clinical Franchise revenue views and the Anchor database
- **Collaboration** is when more than one sales rep work together to close a sale, resulting in incremental growth. Revenue growth, that is a result of an ESD pre-approved collaborative sale, will be eligible for a commission payment.
- **Actual Results** - Your actual results will include all eligible net revenue from accounts personally sold and/or serviced by you and located within your defined sales territory.
- **Total Performance** is defined as the revenue goal established for the territory for Prescription Drug Monitoring measured by net product revenue.
- **Revenue Exceeding Goal** - The excess of territory revenue over the sum of territory baseline plus quota less attrition
- **Percent of Anchor Baseline** - is defined as the measurement of territory Anchor revenue compared to sum of account anchor baselines.
- **Percent of Baseline to Goal Bonus** - For applicable plans, Bonus payment for Component I begins when Revenue exceeds a stated % (e.g., 85%) of Baseline. Above the stated % to Baseline, earned bonus increases from 0 in proportion to the % increase in revenue up to the level of the Territory Goal. When Territory Goal is achieved, a $12,000 bonus is earned.
- **Incremental Revenue** is defined as the increase in 2015 revenue over 2014 revenue on all accounts approved for the High Volume New Account

## Calculation of SIP and Timing of Payments:

- SIP awards are earned when the sale is completed and billed for payment.
- Any payments under this plan will be made quarterly approximately 6 weeks after the end of the fiscal quarter, or as otherwise required by law.
- Your quarterly SIP payment will be prorated based on the number of eligible months in that quarter in which you are assigned to the territory.
- SIP payments will be calculated based on the component detailed in the section below.
- If for any reason an adjustment, such as a revenue or account adjustment, results in a payback, the payback will be taken out of future earnings. Depending on the amount of the payback, it can be paid back in future quarters not to exceed three quarters. To the extent permissible by law, the Company shall have the right to offset any amounts owed by you to the Company, including, but not limited to, paybacks or overpayments, against any wages, SIP payments or any other sums due to you.
- If you are on an approved leave of absence you will continue to receive your SIP payment for up to 3 months from the date your leave commenced. If your leave starts between the 1st & the 14th of the month, for SIP purposes the leave begins the first of that month. If the leave starts between the 15th of the month and the end of the month, for variable incentive purposes the leave begins the first of the following month. These same rules apply to the return to work or end date of the leave. Qualifying sales incentive during a period of leave will be paid on normal SIP pay dates based on actual achievement of the SIP components.

This Policy document and its terms are proprietary and confidential and are subject to the Company's policy concerning the protection of confidential information.

# 2015 Sales Incentive Plan
## PDM Account Executive

◆   The criteria for earning the SIP payment, calculations and sample payouts is as follows:

### Part I: Revenue Growth Above Baseline and Revenue Exceeding Goal

- Bonus paid for revenue growth above 85% of baseline up to 100% of goal (maximum)
- Commission paid for revenue exceeding 100% of goal (uncapped)
- Bonus paid on % in excess of goal up to $3,000 (maximum)

This Policy document and its terms are proprietary and confidential and are subject to the Company's policy concerning the protection of confidential information.

# 2015 Sales Incentive Plan
## PDM Account Executive

This Policy document and its terms are proprietary and confidential and are subject to the Company's policy concerning the protection of confidential information.

# 2015 Sales Incentive Plan
## PDM Account Executive

---

**Part II:  High Volume New Account Bonus**

- Annual bonus for each new account generating >$250K incremental revenue during 2015 regardless of close date
- Bonus paid per account, no limit on the #of New account Bonuses
- Must work through 12/31/2015 to receive payment.  Bonus paid in February, 2016
- Component not eligible for kicker

| 2015 NEW ACCOUNT Revenue | Bonus |
|---|---|
| $250K to $349K | $2,500 |
| $350K to $499K | $3,500 |
| $500K or > | $5,000 |

---

2015 Sales Incentive Plan – PDM - Account Executive

This Policy document and its terms are proprietary and confidential and are subject to the Company's policy concerning the protection of confidential information.

# 2015 Sales Incentive Plan
## PDM Account Executive

## SECTION 409A

The plan is intended to be exempt from the requirements of Section 409A of the Internal Revenue Code of 1986, as amended, and Quest Diagnostics (also hereinafter "the Company") will administer the plan.

## DISPUTES

Any disputes regarding the terms of the Plan, its application, or administration will be addressed in the following manner:

If you believe there are any errors in your compensation, you should discuss any concerns with your immediate supervisor as soon as possible.  If you do not receive an answer in a reasonable time period, or the answer is unsatisfactory, you should contact the Executive Sales Director or the Regional Human Resource Business Partner.  If you do not agree with the decision at this level you should contact the Regional Sales Vice President.  If an issue remains unresolved, you may request that the dispute be addressed by the Senior VP Commercial or his/her designee.  This is the final step in the dispute resolution process.  The Company prohibits and will not tolerate retaliation against any employee because a dispute was filed under this Plan.

## NON SOLICITATION NON DISCLOSURE OBLIGATIONS

I acknowledge and agree that in my capacity as a PDM Account Executive, I have had and continue to have non- solicitation and non-disclosure obligations to the Company.  These obligations are as follows:  For a period of one (1) year following the date my employment is terminated, for any reason, I will not contact or solicit, whether directly or indirectly, any Customer of the Company for the purpose of selling or providing Competitive Services.  For purposes of this Agreement, "Competitive Services" shall refer to products or services that I sold on behalf of the Company during the twelve (12) month period immediately preceding the termination of my employment.  For purposes of this Agreement, "Customer" shall refer to any person or entity to which I, within the twelve (12) months immediately preceding my termination, on behalf of the Company, sold Competitive Services or made a proposal to sell Competitive Services.  For a period of one (1) year following the date my employment is terminated, for any reason, I agree that I will not hire or solicit, whether directly or indirectly, any employee of Quest Diagnostics for a position of employment with any person or entity that competes in providing the goods or services provided by Quest Diagnostics.  This restriction includes and applies to situations where a Quest Diagnostics employee initiates contact with me.  I agree that while employed by Quest Diagnostics and subsequent to such employment, I shall not, for any purpose whatsoever, use, divulge, or disclose to any person or entity any Confidential Information which I have obtained as a result of my association with Quest Diagnostics, and further agree that I shall not in any way make use of any Confidential Information pertaining to Quest Diagnostics' activities or business (other than as authorized in advance by Quest Diagnostics in carrying out my duties under this Agreement).  For purposes of this Agreement, "Confidential Information" means Company information not generally known to the public, including, but is not limited to, business plans, formulas, processes, methods of manufacture, machines, compositions, lists of customers, sales or marketing manuals, strategies, special price tables or schedules, inventions of the Company or any of the Company's affiliates. The

This Policy document and its terms are proprietary and confidential and are subject to the Company's policy concerning the protection of confidential information.

# 2015 Sales Incentive Plan
## PDM Account Executive

law of the State of New Jersey shall govern my non-solicitation and non-disclosure obligations, which are set forth in this section of the Plan. Any dispute related to my non-solicitation and non-disclosure obligations, which are set forth in this section of the Plan, shall be submitted exclusively to the federal or state courts of the State of New Jersey. You expressly submit to the personal jurisdiction of the foregoing federal and state courts and waive any objection or defense based on personal jurisdiction or venue that might otherwise be asserted in proceedings in those courts.

## ACKNOWLEDGEMENT OF UNDERSTANDING

I acknowledge that I have received a copy of the 2015 Sales Incentive Plan for PDM Account Executives. By signing this Acknowledgement, I agree to the terms and conditions as stated in the Plan and understand that this Plan, as modified from time to time by the Company, supersedes any and all previous plans, policies, and oral or written understandings regarding commissions, bonuses, and pay structures, and any other subject matter stated herein, and cannot be modified unless in writing by the Senior VP Commercial, or his/her designee.

I acknowledge that the Company reserves the right to amend, modify or terminate any or all provisions within this Plan, at any time, with or without notice, at its sole discretion. The Senior VP Commercial shall have sole discretion to interpret and administer Plan provisions.

I further understand and agree that my signature is required in order to be eligible for and to be paid any variable sales incentive under this Plan.

I agree to utilize the Dispute provision of this Plan in the event that I have any disagreement with the Company over the terms of this Plan.

I understand that my signature below does not imply or create an employment contract between myself and the Company and in no way guarantees employment with the Company for any length of time. Your employment remains at-will, meaning that you or the Company may terminate the employment relationship at any time, with or without cause, and with or without notice.

_____          _____
PDM - Account Exec's Name (Print)          PDM -Account Exec's Signature   Date

This Policy document and its terms are proprietary and confidential and are subject to the Company's policy concerning the protection of confidential information.

Exhibit D

# LANGJAHR FORSYTH & LOW
### A T T O R N E Y S   A T   L A W

*Janice Forsyth*
*janice.forsyth@lfl-law.com*
Direct: 314-477-8982

October 27, 2015

VIA Email: MHensley@Bressler.com

Michael Hensley, Esq.
Bressler Amery Ross
325 Columbia Turnpike
Florham Park, NJ 07932

Re:     Michael D'Ascoli

Dear Michael:

As we discussed on the phone last week, this firm represents Pharmacy Services, Inc., dba Bellevue Pharmacy and certain of its affiliated entities, including PSI Services, Inc. ("PSI").

PSI has a contract for sales and marketing services with Cordant Health Solutions wherein PSI markets Cordant's lab services. In the course of its day-to-day operations, PSI employed Michael D'Ascoli as of July 6, 2015 as a Toxicology Consultant. PSI now knows from my discussion with you that D'Ascoli remained an employee of Quest until August 14, 2015. Prior to offering Mr. D'Ascoli employment, PSI management requested from Mr. D'Ascoli information regarding any restrictive covenants Mr. D'Ascoli had with Quest. At that time Mr. D'Ascoli provided PSI with a copy of a non-compete agreement from 2010 titled Quest Sales Academy Training Agreement which I have attached to this letter. It was determined that this non-compete language was not applicable to Mr. D'Ascoli's employment with PSI, and you have not raised any possible violation of the non-compete in our conversations or in your letter.

During July and August 2015, PSI was unaware of any possible non-solicitation obligation Mr. D'Ascoli may have owed to Quest. On September 1, 2015 PSI received a copy of a letter to Mr. D'Ascoli dated August 31, 2015 from Paul Kattas at Quest. This was the first indication PSI had that Mr. D'Ascoli was possibly subject to a non-solicitation obligation. The letter from Mr. Kattas does not describe the non-solicitation obligation (nor any confidentiality obligation); therefore, PSI asked Mr. D'Ascoli to provide a copy of whatever document described the alleged obligation. PSI was provided with the attached letter dated February 8, 2012 which appears to be an offer letter for the job of Account Executive, Prescription

Michael Hensley
October 27, 2015
Page 2

Drug Monitoring. After reviewing this letter PSI management instructed Mr. D'Ascoli and those employees working with Mr. D'Ascoli to cease contacting any entities that Mr. D'Ascoli was aware of as a result of working for Quest. In addition, PSI management instructed relevant employees not to solicit any employees of Quest for jobs at PSI. In fact PSI has not hired any former Quest employees other than Mr. D'Ascoli. In addition, following receipt of Mr. Kattas' letter PSI asked Mr. D'Ascoli to contact legal counsel regarding his obligations.

On October 16, 2015 PSI received your letter dated October 15, 2015 in which you describe Mr. D'Ascoli's obligations in addition to the non-solicitation. After reviewing the letter and speaking with management, I requested the client to provide to me all Quest documents which were shared with PSI by Mr. D'Ascoli. I have been assured that the only document provided to or shared with PSI was the document attached hereto referred to as the PDM Roster. While there is a strong argument that this roster does not meet the definition of "Confidential" included in the Quest 2015 Sales Incentive Plan, I can acknowledge on behalf of my client that except for the copy maintained by my office, all copies of the document have been destroyed and PSI no longer has access to the document.

Omitted from your October 15th letter was any description of what Quest considered to be a customer protected under the non-solicitation clause in question. The Quest 2015 Sales Incentive Plan, which you provided to me in response to my request, contains important language not included in your October 15th letter. For instance, the Plan defines a "Customer" as:

> Any person or entity to which I [Mr. D'Ascoli], within the 12 months immediately preceding the termination, on behalf of the Company, sold Competitive Services or made a proposal to sell Competitive Services.

In discussions with Mr. D'Ascoli we have been told that indeed he did not sell or make proposals for Competitive Services for Quest and that other Quest employees made the sales and proposals. PSI is therefore unaware of any entities which would be considered "Customers" under the Sales Incentive Plan and Quest has not provided a list to PSI.

As you are aware, physicians and other referral sources have no obligation to provide orders to any one lab. In part this is a result of the third party payer reimbursement system, which frequently includes the use of limited lab networks, requiring referral sources to send orders to multiple labs in order to obtain reimbursement for their patients. As a result, absent a valid non-solicitation clause, D'Ascoli and PSI would have every right to contact any referral source currently sending orders to Quest. PSI was unaware of any restrictive covenant that would prohibit Mr. D'Ascoli from contacting Quest referral sources until it received Mr. Kattas' letter and therefore PSI did not do anything inappropriate when it contacted Quest referral sources.

Michael Hensley
October 27, 2015
Page 3

PSI made every effort to determine Mr. D'Ascoli's restrictive covenant obligations prior to his employment. Since receiving Mr. Kattas' letter, PSI continued to work to obtain complete information despite receiving incomplete information from both Mr. D'Ascoli and Quest. Mr. Kattas' letter did not provide the relevant non-solicitation language and made no mention of a confidentiality obligation. In response to the Kattas letter D'Ascoli provided PSI with a 2012 Document. Your letter of October 15 was incomplete, and I had to request the Incentive Plan in order to obtain the complete restrictive covenant language, including definitions. It was not until I received the Incentive Plan that Mr. D'Ascoli admitted to PSI that he had signed the Acknowledgement of Understanding.  PSI took all reasonable steps to assure itself that Mr. D'Ascoli was not the subject of any applicable restrictive covenants, was not aware of any non-solicitation clause until September 1, 2015 and then made every effort to ensure that Mr. D'Ascoli and other PSI employees honored what it believed to be the applicable restrictive covenant. I do not believe PSI owes any further obligations to Quest.

Sincerely,

Janice Forsyth

Exhibit E



-----Original Message-----
**From:** Regan, Moriarty [RMoriarty@wellmore.org]
**Sent:** Tuesday, August 11, 2015 11:04 AM Eastern Standard Time
**To:** D'Ascoli, Michael J; Pastore, Kimberly A
**Subject:** RE: Meeting


Michael & Kim,

I spoke with our VP and it looks like August 20th will work the best for us. 12:00 or 1:00?

Thank you,
Regan

Regan Moriarty, LCSW
Clinical Director

# Wellmore

**Behavioral Health**
*Wellness for a lifetime*

402 E. Main Street
Waterbury, CT, 06702
phone: 203-755-1143, x4342
cell:
fax: 203-753-3274

This e-mail and any files transmitted with it contain information from Wellmore which is confidential and/or legally privileged. The information is intended solely for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, you are hereby notified that using, disclosing, copying, distributing, or taking any action in reliance on the contents of the transmitted information is strictly prohibited. If you have received this e-mail in error please notify Wellmore by e-mail, and delete/destroy this message and its attachment(s).

**From:** D'Ascoli, Michael J [mailto:Michael.J.D'Ascoli@questdiagnostics.com]
**Sent:** Wednesday, July 29, 2015 5:59 AM
**To:** Regan, Moriarty
**Subject:** RE: Meeting

Hi Regan,
Hope all is well and that the transition is going smoothly. Just wanted to check in and see if you had any time available for you & I to meet for a few minutes in the next week or so. Let me know what your schedule looks like. Thanks!

1

Sent with Good (www.good.com)


-----Original Message-----
**From:** Regan, Moriarty [RMoriarty@wellmore.org]
**Sent:** Tuesday, June 30, 2015 06:31 PM Eastern Standard Time
**To:** D'Ascoli, Michael J
**Subject:** Re: Meeting

Michael,
Let me check in with our team on some dates and times. I'm thinking the week of July 13th. Any time/day That does not work for you?

Sent from my Verizon 4G LTE Smartphone

------ Original message------
**From:** D'Ascoli, Michael J
**Date:** Tue, Jun 30, 2015 6:02 PM
**To:** Joy, Powell;
**Cc:** Regan, Moriarty;
**Subject:** RE: Meeting


Thanks Joy!
Good luck in your new role, it's been a pleasure working with you and your team over the last few years.
If there is anything I can do to help during your transition please let me know.


Hi Regan,
Would you be available to meet anytime in the next week or two?
Thanks!


Best Regards,

Michael J. D'Ascoli
Quest Diagnostics | Prescription Drug Monitoring Specialist | 3 Sterling Drive | Wallingford, CT 06492 | phone -
1.800.982.6810 x7103 | mobile - (203) 228-0624 michael.j.d'ascoli@questdiagnostics.com| www.QuestDiagnostics.com

**From:** Joy, Powell [mailto:JPowell@wellmore.org]
**Sent:** Tuesday, June 30, 2015 10:47 AM
**To:** D'Ascoli, Michael J
**Cc:** Regan, Moriarty
**Subject:** RE: Meeting

Hi Michael —
Hope you're well, I am forwarding your email to Regan Moriarty, as I am phasing out of my current role and will be out of the office during some of that transition as well — thanks!
Joy


_____
Joy Powell, LCSW
Director - Adult Outpatient

2

# Wellmore

**Behavioral Health**
*Wellness for a lifetime*

402 East Main Street
Waterbury, CT, 06702
phone: 203-755-1143, x4392
cell: (203) 528-7715
fax: (203) 753-3274

This e-mail and any files transmitted with it contain information from Wellmore which is confidential and/or legally privileged. The information is intended solely for the use of the individual or entity to whom it is addressed. If you are not the intended recipient, you are hereby notified that using, disclosing, copying, distributing, or taking any action in reliance on the contents of the transmitted information is strictly prohibited. If you have received this e-mail in error please notify Wellmore by e-mail, and delete/destroy this message and its attachment(s).

**From:** D'Ascoli, Michael J [mailto:Michael.J.D'Ascoli@questdiagnostics.com]
**Sent:** Tuesday, June 30, 2015 8:59 AM
**To:** Joy, Powell
**Subject:** Meeting

Hi Joy,
I hope this email finds you doing well and that you are enjoying the summer.
I was hoping that we could schedule some time to meet in order to discuss some potential improvements/enhancements that I can offer your organization from a laboratory perspective.  Please let me know what would work best for your schedule over the next couple weeks.  It shouldn't take more than 20-30 minutes. Thanks. I look forward to catching up.

Best Regards,

Michael J. D'Ascoli
Quest Diagnostics | Prescription Drug Monitoring Specialist | 3 Sterling Drive | Wallingford, CT 06492 | phone - 1.800.982.6810 x7103 | mobile - (203) 228-0624 michael.j.d'ascoli@questdiagnostics.com| www.QuestDiagnostics.com

**From:** Freda, Driscoll-Sbar [mailto:fdriscoll-sbar@wellmore.org]
**Sent:** Wednesday, April 23, 2014 11:45 AM
**To:** Pastore, Kimberly A
**Cc:** Christopher, Young; Marcia, Geddes; Joy, Powell; Maldonado, Jennifer A; Jaime, Mastroianni; LaBarre, Kelley A; Sullivan, Kevin J; D'Ascoli, Michael J; Regan, Moriarty; Sylvia, Santos
**Subject:** RE: Wellmore and Quest Catch Up
**Importance:** High

Kim,
I apologize but I don't recall offering this particular time.  If I did it no longer seems to work in a number of schedules.  The only common time I can find for all of the Wellmore players is Tues 5/6 at 11 am.  Sorry.

-----Original Appointment-----
**From:** Freda, Driscoll-Sbar **On Behalf Of** Pastore, Kimberly A
**Sent:** Wednesday, April 23, 2014 9:48 AM
**To:** Christopher, Young; Marcia, Geddes; Joy, Powell
**Cc:** Pastore, Kimberly A
**Subject:** Fw: Wellmore and Quest Catch Up
**When:** Thursday, May 8, 2014 9:00 AM-10:00 AM (GMT-05.00) Eastern Time (US & Canada).
**Where:** 141 E Main St Waterbury CT 06702

For some, reason Kim's email didn't through to you so I am forwarding.

Freda


Sent from my Verizon Wireless 4G LTE Smartphone




------ Original message------

**From:** Pastore, Kimberly A

**Date:** Wed, 4/23/2014 7:58 AM

**To:** Freda, Driscoll-Sbar;Jennifer.A.Maldonado;Jaime,
Mastroianni;Kelley.A.LaBarre;Kevin.J.Sullivan;Michael.J.D'Ascoli;Regan, Moriarty;Sylvia, Santos;

**Subject:**Wellmore and Quest Catch Up


The contents of this message, together with any attachments, are intended only for the use of the person(s) to which they are addressed and may contain confidential and/or privileged information. Further, any medical information herein is confidential and protected by law. It is unlawful for unauthorized persons to use, review, copy, disclose, or disseminate confidential medical information. If you are not the intended recipient, immediately advise the sender and delete this message and any attachments. Any distribution, or copying of this message, or any attachment, is prohibited.


The contents of this message, together with any attachments, are intended only for the use of the person(s) to which they are addressed and may contain confidential and/or privileged information. Further, any medical information herein is confidential and protected by law. It is unlawful for unauthorized persons to use, review, copy, disclose, or disseminate confidential medical information. If you are not the intended recipient, immediately advise the sender and delete this message and any attachments. Any distribution, or copying of this message, or any attachment, is prohibited.


The contents of this message, together with any attachments, are intended only for the use of the person(s) to which they are addressed and may contain confidential and/or privileged information. Further, any medical information herein is confidential and protected by law. It is unlawful for unauthorized persons to use, review, copy, disclose, or disseminate confidential medical information. If you are not the intended recipient, immediately advise the sender and delete this message and any attachments. Any distribution, or copying of this message, or any attachment, is prohibited.


The contents of this message, together with any attachments, are intended only for the use of the person(s) to

which they are addressed and may contain confidential and/or privileged information. Further, any medical information herein is confidential and protected by law. It is unlawful for unauthorized persons to use, review, copy, disclose, or disseminate confidential medical information. If you are not the intended recipient, immediately advise the sender and delete this message and any attachments. Any distribution, or copying of this message, or any attachment, is prohibited.

The contents of this message, together with any attachments, are intended only for the use of the person(s) to which they are addressed and may contain confidential and/or privileged information. Further, any medical information herein is confidential and protected by law. It is unlawful for unauthorized persons to use, review, copy, disclose, or disseminate confidential medical information. If you are not the intended recipient, immediately advise the sender and delete this message and any attachments. Any distribution, or copying of this message, or any attachment, is prohibited.

Exhibit F

Linked in ®          What is LinkedIn?    Join Today    Sign In



# Mike D'Ascoli

**336** connections

Director of Toxicology Sales at Quest Diagnostics

Hartford, Connecticut Area | Hospital & Health Care

| | |
|---|---|
| Current | Quest Diagnostics |
| Previous | Shire Pharmaceuticals |
| Education | Quinnipiac University |

## Join LinkedIn and access Mike's full profile. It's free!

As a LinkedIn member, you'll join 300 million other professionals who are sharing connections, ideas, and opportunities.

- See who you know in common
- Get introduced
- Contact Mike directly

[View Mike's Full Profile]

## Summary

Quest Diagnostics
PDM Specialist
Work directly with C-Suite & Medical Directors to develop lasting clinical & professional partnerships. Educate physicians about the clinical/legal benefits of implementing SOP for medication compliance. Train reps in selling PDM & assist w/ sales situations requiring more subject matter expertise.
- •. Achieved 138% to quota YTD '14
- •. Ranked #2 of 28 in Nation YTD '14
- •. Achieved 130% to quota FY '13
- •. Ranked #3 of 28 in Nation FY '13
- • Achieved 120% to quota YTD 2012
- • Ranked # 4 of 25 in Nation 2012

Account Manager
Retain & grow $8 million book of business. Prospect new business opportunities. Sold complete line of diagnostic testing as well as connectivity needs (electronic health records, bi-directional interfaces & e-prescribing)
- • Achieved 105% to quota FY 2011
- • Ranked #1 out of 20 reps in CT FY2011
- • Ranked # 11 out of 110 reps in East Region FY2011
- • Ranked #35 out of 360 reps in Nation FY 2011
- • Awarded Rookie of the Year FY2011

Shire Pharmaceuticals
Executive Sales Professional
Field Sales Supervisor
Management Development Program
- • Ranked #4 out of 90 reps in NE Zone FY 2010
- • Ranked #104 out of 500 reps in Nation FY 2010
- • Ranked #9 out of 90 reps in NE Zone FY '09
- • Ranked #87 out of 500 reps in Nation FY '09
- • Promoted into FST/ Management Development Program FY '09 (1 of 36 nationally)
- • Received NE Zone Beacon Award FY '09 sales growth & leadership (1 of 4 nationally)
- • Ranked #8 out of 90 reps in NE Zone FY '07
- • Ranked #80 out of 500 reps in Nation FY '07
- • Promoted to Executive Sales Professional FY '07
- • Ranked #7 out of 90 reps in Northeast Zone FY '06

## Find a different Mike D'Ascoli

First Name | Last Name | 🔍

**Example:** Mike D'Ascoli

 Pastor Mike Dascoli
Senior Pastor at Summit Church
United States

 Michael Dascoli
Default Specialist II at PNC Bank
United States

 Michael Dascoli
--
United States

 Michael Dascoli
contractor
United States

 Mike Dascoli
Computer Housecalls, Proprietor
United States

More professionals named Mike D'Ascoli

## People Also Viewed

 Matthew Kenyon
Cardio Metabolic Account Executive at Quest Diagnostics (formerly Berkeley HeartLab)

 Jennifer (Teller) Maldonado
Sales Director Commercial at Quest Diagnostics

 Phil Lipnick
Principal at Toxicology & Clinical Consultants, LLC

 Kristin Conley
Special Education Teacher at Norristown Area School District

 Thomas Malec
Regional Sales Manager at Bellevue

 Jamal Ghafari
Toxicology Sales Executive

Mark Charles
Sales

Gary Casto
Zone Director, Southwest Zone

Brian Henderson
Regional Sales Representative at Implant Direct Sybron International

Sandra Holloway
Senior Account Specialist at Solta Medical, Inc.

Case 2:15-cv-07943-KM-JBC   Document 1-1   Filed 11/06/15   Page 85 of 101 PageID: 89

**Linked in**                                 What is LinkedIn?   Join Today   Sign In

FOR BUSINESS TRAVEL

Earn
**60,000**
BONUS POINTS
20% Off Travel Redemptions
No Foreign Transaction Fees
Trip Cancellation Insurance

LEARN MORE

- Ranked #22 out of 500 reps Nationally FY '05
- Achieved Presidents Club Impact Award FY '05 (top 5% nationally)
- Promoted to Field Sales Trainer FY '05
- Ranked #14 out of 90 reps in Northeast Zone FY '04
'04

## Experience

### PDM Account Executive
Quest Diagnostics
October 2010 – Present (5 years 1 month) | Connecticut (entire state)

I am responsible for driving new PDM business while helping to develop a new marketplace for this type of testing. I target & close new business opportunities as well as assist clinical reps organically grow current PDM accounts (manage w/o authority). I regularly interface with local District Sales Managers & Sales Directors to review business opportunities and provide sales forecasts for the state. I report to a National Sales Director of a specialty sales team (25 reps in country).

### Field Sales Trainer
Shire Pharmaceuticals
May 2003 – September 2010 (7 years 5 months) | Northeast

I was a corporate & field sales trainer for both new & tenured representatives. Responsibilities included field travel & performance reviews with reps & managers, leading corporate (classroom style) sales training sessions & participating in management development programs.

### Executive Sales Professional
Shire Pharmaceuticals
May 2003 – September 2010 (7 years 5 months)

## Skills

Pharmaceutical Sales   Urology   Endocrinology   Gastroenterology   Cardiology

Neurology   Rheumatology   Allergy   Territory Management   Cold Calling

Managed Care   OB/GYN   Sales   Sales Management   Sales Presentations

See 8+ >

## Education

### Quinnipiac University
BA, Mass Communications
1999 – 2002



### Plymouth State University
1997 – 1999





Exhibit G

Paul L. Kattas
Senior Corporate Counsel
3 Giralda Farms
Madison, NJ 07940
973-520-2030
Paul.L.Kattas@questdiagnostics.com



<u>**Via Fedex and Regular Mail**</u>

**August 31, 2015**

Michael D'Ascoli
4 Benjamin Lane
East Haddam, CT 06423

Re:  <u>Non-Solicitation Obligation</u>

Dear Mr. D'Ascoli:

I am in-house counsel to Quest Diagnostics.  As you are aware, you are obligated not to solicit Quest Diagnostics' customers for a one year period after your separation from our Company.

We have reason to believe you may be in violation of your obligations to Quest Diagnostics.  Quest Diagnostics expects that you will comply with your non-solicitation obligation going forward.  If you fail to do so, Quest Diagnostics will take all appropriate, lawful options that are available to it.

Quest Diagnostics reserves all of its rights and remedies.

Very truly yours,

Paul L. Kattas

cc: Cordant Health Solutions
       office of GC

Exhibit H

# BRESSLER, AMERY & ROSS

A PROFESSIONAL CORPORATION

P.O. Box 1980 • Morristown, NJ 07962

Hand Delivery:

325 Columbia Turnpike • Suite 301 • Florham Park, NJ 07932

973.514.1200 • fax 973.514.1660

www.bressler.com

Michael T. Hensley
Member

Direct:  973-660-4473
mhensley@bressler.com

October 15, 2015

**VIA FEDERAL EXPRESS**
Michael D'Ascoli
4 Benjamin Lane
East Haddam, CT 06423

Re:   **Quest Diagnostics Incorporated v. Michael D'Ascoli**

Dear Mr. D'Ascoli:

This firm represents Quest Diagnostics Incorporated ("Quest").  Please allow this letter to supplement the August 31, 2015 letter from Paul L. Kattas, Esq. of Quest regarding your post-employment obligations.

In August 2015, Quest had reason to believe that you were violating your non-solicitation obligations and wrote to you insisting you comply with your post-employment obligations.  You failed to respond to that letter.  Subsequently, Quest performed a forensic analysis of the hard drive from your Quest laptop computer and Apple iPad. This forensic analysis revealed **egregious violations** of your post-employment obligations, including that you not only engaged in improper solicitations, but also misappropriated highly confidential, proprietary and sensitive information and documents.  The forensic analysis cannot be refuted, and reveals your actions to be blatant violations of your obligations to Quest, and raises the possibility that your employer, Cordant Health Solutions ("Cordant"), may be interfering with your obligations to Quest.

As set forth below, you have until Monday, October 19, 2015 to adequately respond to each and every request below.  If you fail to adequately respond, Quest reserves any and all rights, including filing a lawsuit seeking injunctive relief, compensatory damages, incidental damages, consequential damages, punitive damages, costs of suit, interest and attorneys' fees.

You acknowledged and agreed in your capacity as a PDM Account Executive at Quest, in part:

New Jersey  •  New York  •  Florida  •  Alabama

BRESSLER, AMERY & ROSS
A PROFESSIONAL CORPORATION

October 15, 2015
Page 2

For a period of one (1) year following the date my employment is terminated, for any reason, I will not contact or solicit, whether directly or indirectly, any Customer of the Company for the purpose of selling or providing Competitive Services.

\* \* \*

For a period of one (1) year following the date my employment is terminated, for any reason, I agree that I will not hire or solicit, whether directly or indirectly, any employee of Quest Diagnostics for a position of employment with any person or entity that competes in providing the goods or services provided by Quest Diagnostics.

\* \* \*

I agree that while employed by Quest Diagnostics and subsequent to such employment, I shall not, for any purpose whatsoever, use, divulge, or disclose to any person or entity any Confidential Information which I have obtained as a result of my association with Quest Diagnostics, and further agree that I shall not in any way make use of any Confidential Information pertaining to Quest Diagnostics' activities or business . . . For purposes of this Agreement, "Confidential Information" means Company information not generally known to the public, including, but is not limited to, business plans, formulas, processes, methods of manufacture, machines, compositions, lists of customers, sales or marketing manuals, strategies, special price tables or schedules, inventions of the Company or any of the Company's affiliates.

Notwithstanding the above obligations, in addition to violating your non-solicitation obligation, a forensic analysis revealed that you e-mailed voluminous highly sensitive Confidential Information to your private e-mail address immediately prior to leaving the employment of Quest. Your conduct expressly violated your post-employment obligations set forth above.

Quest intends to enforce its contractual and legal rights. Quest hereby demands that you immediately cease and desist from all further action to solicit Quest's business, either directly or indirectly, and attempt to cure your improper misappropriation of Confidential Information. Accordingly, Quest demands the following:

BRESSLER, AMERY & ROSS

A PROFESSIONAL CORPORATION

October 15, 2015
Page 3

1.     Provide a detailed accounting under oath of the names of all Quest clients, customers and employees you have contacted since your departure from Quest, including dates of contact and nature of discussions;

2.     Provide a detailed accounting under oath of the names of Quest clients, customers and employees you have worked on, solicited or accepted business on behalf of Cordant;

3.     Agree under oath to refrain from any further violations of your non-solicitation obligations;

4.     Provide a detailed accounting under oath, and return to Quest, the originals and all copies of any Confidential Information belonging to Quest which remains in your possession, and identify each person you shared this Confidential Information with and method in which you shared same;

5.     Agree under oath to refrain from any further violations of your non-disclosure obligations;

6.     Obtain a declaration from Cordant providing: A) a detailed accounting under oath of the names of Quest clients, customers and employees you shared with Cordant, B) a detailed accounting under oath of the names of Quest clients, customers and employees that have accepted business from Cordant after you left the employment of Quest, and C) a detailed accounting under oath of all Quest Confidential Information that came into Cordant's possession, and an acknowledgment that that all originals and copies of such Confidential Information has been returned to Quest with not traces being retained by Cordant.

In the event you fail to comply with the above requests by 5:00 p.m. on Monday, October 19, 2015, Quest reserves all rights and remedies, including the right to commence legal proceedings against you without further notice. In any such action, Quest will seek emergent injunctive relief, compensatory, incidental, consequential and punitive damages, costs of suit, interest and attorneys' fees.

This letter is sent without prejudice to all rights and remedies available to Quest. Please directly all future correspondence to my attention.

Very truly yours,

Michael T. Hensley

MTH/id
cc:     Cordant Health Solutions (via Federal Express)
        (Office of the General Counsel)

MICHAEL T. HENSLEY, Id. No. 031952001
BRESSLER, AMERY & ROSS
A Professional Corporation
325 Columbia Turnpike
Florham Park, New Jersey 07932
P.O. Box 1980
Morristown, New Jersey 07962
(973) 514-1200
Attorneys for Plaintiff
Quest Diagnostics Incorporated

| | |
|---|---|
| QUEST DIAGNOSTICS INCORPORATED,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL D'ASCOLI,<br><br>Defendant. | SUPERIOR COURT OF NEW JERSEY<br>CHANCERY DIVISION –<br>GENERAL EQUITY<br>MORRIS COUNTY<br>DOCKET NO: C- *151-15*<br><br>Civil Action<br><br>**ORDER TO SHOW CAUSE WITH TEMPORARY, PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF** |

THIS MATTER opened to the Court upon the emergent motion of Bressler, Amery & Ross, P.C., attorneys for Plaintiff Quest Diagnostics Incorporated ("Quest"), seeking relief by way of temporary, preliminary and permanent injunctive relief pursuant to R. 4:52, based upon the facts set forth in the Verified Complaint filed herewith and Affidavit of Geoffrey S. Albrecht, and based on the law set forth in the attached Brief; and it appearing that Defendant Michael D' Ascoli ("D'Ascoli") had notice of this application and for good cause shown,

It is on this _____ day of _____ **ORDERED** that D'Ascoli appear and show cause before the Superior Court at the Morris County Courthouse, New Jersey on _____, 2015 at _____ a.m. or as soon thereafter as counsel can be heard, why an order should not be issued preliminarily enjoining and restraining D'Ascoli, and anyone acting at his direction, from:

1

1.     Possessing, utilizing or disclosing to third parties, Quest's Confidential Information, defined pursuant to the 2015 Sales Incentive Plan (the "Plan") as information not generally known to the public, including, but not limited to, business plans, formulas, processes, methods of manufacture, machines, compositions, lists of customers, sales or marketing manuals, strategies, special price tables or schedules, inventions of Quest or any of Quest's affiliates;

2.     Contacting or soliciting, whether directly or indirectly, any Quest Customer, (defined pursuant to the Plan as any person or entity to which D'Ascoli, within the twelve (12) month period immediately preceding D'Ascoli's termination, on behalf of Quest, sold Competitive Services or made a proposal to sell Competitive Services) for the purpose of selling or providing Competitive Services (defined pursuant to the Plan as products or services that D'Ascoli sold on behalf of Quest during the twelve (12) month period immediately preceding the termination of his employment) up and until August 14, 2016;

3.     A constructive trust be imposed on all income resulting from D'Ascoli's misconduct; and

4.     Granting such other relief as the Court deems equitable and just.

It is **FURTHER ORDERED** that, pending further hearing on this Order to Show Cause, D'Ascoli is temporarily enjoined and restrained as follows:

5.     Within seven (7) days of the date of entry of this order, D'Ascoli shall provide an accounting under oath of all Quest Confidential Information D'Ascoli took from Quest at any point prior to his termination from Quest, including but not limited to the information identified by the forensic accounting that was e-mailed to D'Ascoli's personal email on August 3, 2015;

6.     Within seven (7) days of the date of entry of this order, D'Ascoli shall provide an accounting under oath of all Quest Confidential Information D'Ascoli disclosed to third-parties,

the identities of those third-parties, and identify which Confidential Information was provided to each and every third-party;

7.      Within seven (7) days of the date of entry of this order, D'Ascoli shall return to Quest's counsel all Quest Confidential Information, including all copies thereof, as well as all originals and all copies of works, whether prepared by D'Ascoli or others, in his possession or in the possession of others, and to certify under oath to Quest's counsel that all such Quest Confidential Information has been returned;

8.      Within seven (7) days of the date of entry of this order, D'Ascoli shall provide to Quest's counsel an accounting under oath of the names of all Quest Customers that D'Ascoli contacted or solicited, directly or indirectly, on behalf of another company or individual while still employed by Quest;

9.      Within seven (7) days of the date of entry of this order, D'Ascoli shall provide to Quest's counsel an accounting under oath of the names of all Quest Customers that D'Ascoli contacted or solicited, directly or indirectly, on behalf of another company or individual after the termination of his employment with Quest,

10.     D'Ascoli shall immediately refrain from holding himself out as being associated with Quest;

11.     D'Ascoli shall immediately refrain from further contacting or soliciting, directly or indirectly, all Quest Customers until the return date of the preliminary injunction;

12.     D'Ascoli shall immediately refrain from utilizing any Quest Confidential Information for any purpose; and

13.     Permit Quest to conduct discovery on an expedited basis;

It is **FURTHER ORDERED** that:

A.    D'Ascoli may move to dissolve or modify the temporary restraints herein contained on two (2) days notice to Quest's attorney;

B.    A copy of this Order to Show Cause, Verified Complaint, Brief and any supporting Affidavits or Certifications submitted in support of this application, be served upon D'Ascoli's within seven (7) days of the date hereof, in accordance with R. 4:4-3 and R. 4:4-4, this being original process;

C.    Quest must file with the court its proof of service of the pleadings on D'Ascoli no later than three (3) days before the return date;

D.    D'Ascoli shall file and serve a written response to this Order to Show Cause and the request for entry of injunctive relief and proof of service by _____ ___, 2015.  The original documents must be filed with the Clerk of the Superior Court in the county listed above. A directory of these offices is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/prose/10153 deptyclerklawref.pdf. You must send a copy of your opposition papers directly to Judge _____, whose address is Superior Court at the Morris County Courthouse Washington & Court Streets Morristown, New Jersey 07960.  You must also send a copy of your opposition papers to Quest's attorney whose name and address appears above. A telephone call will not protect your rights; you must file your opposition and pay the required fee and serve your opposition on your adversary, if you want the court to hear your opposition to the injunctive relief Quest is seeking;

E.    Quest must file and serve any written reply to D'Ascoli's order to show cause opposition by _____ ___, 2015.   The reply papers must be filed with the

Clerk of the Superior Court in the county listed above and a copy of the reply papers must be sent directly to the chambers of Judge _____;

F.     If D'Ascoli does not file and serve opposition to this order to show cause, the application will be decided on the return date and relief may be granted by default, provided that Quest files a proof of service and a proposed form of order at least three days prior to the return date;

G.     D'Ascoli take notice that Quest has filed a lawsuit against you in the Superior Court of New Jersey. The Verified Complaint attached to this Order to Show Cause states the basis of the lawsuit. If you dispute this complaint, you, or your attorney, must file a written answer to the complaint and proof of service within 35 days from the date of service of this order to show cause; not counting the day you received it.  These documents must be filed with the Clerk of the Superior Court in the county listed above. A directory of these offices is available in the  Civil  Division  Management  Office  in  the  county  listed  above  and  online  at http://www.judiciary.state.nj.us/prose/10153 deptyclerklawref.pdf. Include a $175.00 filing fee payable to the "Treasurer State of New Jersey."  You must also send a copy of your Answer to Quest's attorney whose name and address appear above.  A telephone call will not protect your rights; you must file and serve your Answer (with the fee) or judgment may be entered against you by default.  Please note: Opposition to the order to show cause is not an Answer and you must file both.  Please note further: if you do not file and serve an Answer within 35 days of this Order, the Court may enter a default against you for the relief plaintiff demands;

H.     If you cannot afford an attorney, you may call the Legal Services office in the county in which you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal

assistance you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/prose/10153_deptyclerklawref.pdf; and

      I.     The court will entertain argument, but not testimony, on the return date of the order to show cause, unless the court and parties are advised to the contrary no later than ___ days before the return date.

 

                                    _____

                                                                      , J.S.C

MICHAEL T. HENSLEY, Id. No. 031952001
BRESSLER, AMERY & ROSS
A Professional Corporation
325 Columbia Turnpike
Florham Park, New Jersey 07932
P.O. Box 1980
Morristown, New Jersey 07962
(973) 514-1200
Attorneys for Plaintiff
Quest Diagnostics Incorporated

| | |
|---|---|
| QUEST DIAGNOSTICS INCORPORATED,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL D'ASCOLI,<br><br>Defendant. | SUPERIOR COURT OF NEW JERSEY<br>CHANCERY DIVISION –<br>GENERAL EQUITY<br>MORRIS COUNTY<br>DOCKET NO: C- *151-15*<br><br>Civil Action<br><br>**CERTIFICATION OF<br>TELEPHONE NOTICE** |

MICHAEL T. HENSLEY, ESQ., of full age, hereby declares and certifies:

1.      I am an attorney at law of the State of New Jersey and a Principal of the firm

Bressler, Amery & Ross, P.C., counsel for Quest Diagnostics Incorporated.

2.      I submit this certification in support of Plaintiff's application for an Order to

Show Cause with Temporary Restraints.

3.      On November 3, 2015, at 10:12 a.m. I e-mailed and left a detailed voicemail with

Barry J. Waters, counsel for the Defendant, and advised him that on Wednesday, November 4,

2015, this firm would be appearing before the Honorable Stephen C. Hansbury, J.S.C. for an

Order to Show Cause with Temporary Restraints.

I hereby certify that the above information is true and accurate to the best of my

knowledge and belief.  I am aware that if any of the above statements are willfully false, I am

subject to punishment.

Michael T. Hensley

Dated:  November 3, 2015
2860725_1

**Appendix XII-B1**

| | FOR USE BY CLERK'S OFFICE ONLY |
|---|---|
| | PAYMENT TYPE: ☐ CK   ☐ CG   ☐ CA |

# CIVIL CASE INFORMATION STATEMENT
## (CIS)

Use for initial Law Division
Civil Part pleadings (not motions) under Rule 4:5-1.
**Pleading will be rejected for filing, under Rule 1:5-6(c), if
information above the black bar is not completed or if attorney's
signature is not affixed.**

| FOR USE BY CLERK'S OFFICE ONLY |
|---|
| PAYMENT TYPE: ☐ CK   ☐ CG   ☐ CA |
| CHG/CK NO. |
| AMOUNT: |
| OVERPAYMENT: |
| BATCH NUMBER: |

| ATTORNEY/PRO SE NAME | TELEPHONE NUMBER | COUNTY OF VENUE |
|---|---|---|
| Michael T. Hensley | (973) 514-1200 | Morris |

| FIRM NAME (If applicable) | DOCKET NUMBER (When available) |
|---|---|
| Bressler, Amery & Ross, P.C. | C-151-15 |

| OFFICE ADDRESS | 1. DOCUMENT TYPE |
|---|---|
| 325 Columbia Turnpike<br>Florham Park, NJ 07932 | Verified Complaint |
| | 2. JURY DEMAND   ☒ YES  ☐ NO |

| NAME OF PARTY (e.g. John Doe, Plaintiff) | CAPTION |
|---|---|
| Quest Diagnostics Incorported | Quest Diagnostics Incorported v. Michael D'Ascoli |

| CASE TYPE NUMBER<br>(See reverse side for listing) | HURRICANE SANDY<br>RELATED | IS THIS A PROFESSIONAL MALPRACTICE CASE? ☐ YES ☒ NO |
|---|---|---|
| 509 | ☐ YES ☒ NO | IF YOU HAVE CHECKED "YES," SEE N.J.S.A. 2A:53A-27 AND APPLICABLE CASE LAW<br>REGARDING YOUR OBLIGATION TO FILE AN AFFIDAVIT OF MERIT. |

| RELATED CASES PENDING? | IF YES, LIST DOCKET NUMBERS |
|---|---|
| ☐ YES ☒ NO | |

| 3. DO YOU ANTICIPATE ADDING ANY<br>PARTIES (arising out of same transaction or occurrence)?<br>☐ YES ☒ NO | NAME OF DEFENDANT'S PRIMARY INSURANCE COMPANY, IF KNOWN |
|---|---|
| | ☒ NONE<br>☐ UNKNOWN |

**THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE.**

CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

| DO PARTIES HAVE A CURRENT,<br>PAST OR RECURRENT RELATIONSHIP?<br>☒ YES  ☐ NO | IF YES, IS THAT<br>RELATIONSHIP | ☒ EMPLOYER-EMPLOYEE<br>☐ FAMILIAL | ☐ FRIEND/NEIGHBOR<br>☐ BUSINESS | ☐ OTHER     (explain) |
|---|---|---|---|---|

| DOES THE STATUTE GOVERNING THIS<br>CASE PROVIDE FOR PAYMENT OF FEES BY<br>THE LOSING PARTY?  ☐ YES ☒ NO |
|---|

USE THIS SPACE TO ALERT THE COURT TO ANY SPECIAL CASE CHARACTERISTICS
THAT MAY WARRANT INDIVIDUAL MANAGEMENT OR ACCELERATED DISPOSITION:

N/A

| ♿ | DO YOU OR YOUR CLIENT NEED ANY<br>DISABILITY ACCOMMODATIONS?<br>☐ YES ☒ NO | IF YES, PLEASE IDENTIFY THE REQUESTED ACCOMMODATIONS: |
|---|---|---|
| | WILL AN INTERPRETER BE NEEDED?<br>☐ YES ☒ NO | IF YES, FOR WHAT LANGUAGE: |

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all
documents submitted to the future in accordance with Rule 1:38-7(b).

ATTORNEY SIGNATURE

Michael T. Hensley                                          11/2/15

Effective 05-04-2015, CN 10517-English

**SIDE 2**

 

CIVIL CASE INFORMATION STATEMENT
(CIS)
Use for initial pleadings (not motions) under *Rule* 4:5-1

---

**CASE TYPES** (Choose one and enter number of case type in appropriate space on the reverse side.)

**Track I – 150 days' discovery**

| | |
|---|---|
| 151 | NAME CHANGE |
| 175 | FORFEITURE |
| 302 | TENANCY |
| 399 | REAL PROPERTY (other than Tenancy, Contract, Condemnation, Complex Commercial or Construction) |
| 502 | BOOK ACCOUNT (debt collection matters only) |
| 505 | OTHER INSURANCE CLAIM (including declaratory judgment actions) |
| 506 | PIP COVERAGE |
| 510 | UM or UIM CLAIM (coverage issues only) |
| 511 | ACTION ON NEGOTIABLE INSTRUMENT |
| 512 | LEMON LAW |
| 801 | SUMMARY ACTION |
| 802 | OPEN PUBLIC RECORDS ACT (summary action) |
| 999 | OTHER (Briefly describe nature of action) |

**Track II – 300 days' discovery**

| | |
|---|---|
| 305 | CONSTRUCTION |
| 509 | EMPLOYMENT (other than CEPA or LAD) |
| 599 | CONTRACT/COMMERICAL TRANSACTION |
| 603N | AUTO NEGLIGENCE – PERSONAL INJURY (non-verbal threshold) |
| 603Y | AUTO NEGLIGENCE – PERSONAL INJURY (verbal threshold) |
| 605 | PERSONAL INJURY |
| 610 | AUTO NEGLIGENCE - PROPERTY DAMAGE |
| 621 | UM or UIM CLAIM (includes bodily injury) |
| 699 | TORT – OTHER |

**Track III -- 450 days' discovery**

| | |
|---|---|
| 005 | CIVIL RIGHTS |
| 301 | CONDEMNATION |
| 602 | ASSAULT AND BATTERY |
| 604 | MEDICAL MALPRACTICE |
| 606 | PRODUCT LIABILITY |
| 607 | PROFESSIONAL MALPRACTICE |
| 608 | TOXIC TORT |
| 609 | DEFAMATION |
| 616 | WHISTLEBLOWER/CONSCIENTIOUS EMPLOYEE PROTECTION ACT (CEPA) CASES |
| 617 | INVERSE CONDEMNATION |
| 618 | LAW AGAINST DISCRIMINATION (LAD) CASES |

**Track IV -- Active Case Management by Individual Judge / 450 days' discovery**

| | |
|---|---|
| 156 | ENVIRONMENTAL/ENVIRONMENTAL COVERAGE LITIGATION |
| 303 | MT. LAUREL |
| 508 | COMPLEX COMMERCIAL |
| 513 | COMPLEX CONSTRUCTION |
| 514 | INSURANCE FRAUD |
| 620 | FALSE CLAIMS ACT |
| 701 | ACTIONS IN LIEU OF PREROGATIVE WRITS |

**Multicounty Litigation (Track IV)**

| | | | | |
|---|---|---|---|---|
| 266 | HORMONE REPLACEMENT THERAPY (HRT) | | 288 | PRUDENTIAL TORT LITIGATION |
| 271 | ACCUTANE/ISOTRENTINOIN | | 289 | REGLAN |
| 274 | RISPERDAL/SEROQUEL/ZYPREXA | | 290 | POMPTON LAKES ENVIRONMENTAL LITIGATION |
| 278 | ZOMETA/AREDIA | | 291 | PELVIC MESH/GYNECARE |
| 279 | GADOLINIUM | | 292 | PELVIC MESH/BARD |
| 281 | BRISTOL-MYERS SQUIBB ENVIRONMENTAL | | 293 | DEPUY ASR HIP IMPLANT LITIGATION |
| 282 | FOSAMAX | | 295 | ALLODERM REGENERATIVE TISSUE MATRIX |
| 284 | NUVARING | | 296 | STTRYKER REJUVENATE/ABG II MODULAR HIP STEM COMPONENTS |
| 285 | STRYKER TRIDENT HIP IMPLANTS | | 297 | MIRENA CONTRACEPTIVE DEVICE |
| 286 | LEVAQUIN | | 601 | ASBESTOS |
| 287 | YAZ/YASMIN/OCELLA | | 623 | PROPECIA |

If you believe this case requires a track other than that provided above, please indicate the reason on Side 1, in the space under "Case Characteristics."

Please check off each applicable category: ☐ Putative Class Action ☐ Title 59